# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DELL, INC., | § | |
| | § | |
| Respondent-Below, | § | |
| Appellant/Cross-Appellee, | § | No. 565, 2016 |
| | § | |
| v. | § | Court Below: |
| | § | |
| MAGNETAR GLOBAL EVENT DRIVEN | § | Court of Chancery |
| MASTER FUND LTD; MAGNETAR | § | of the State of Delaware |
| CAPITAL MASTER FUND LTD; | § | |
| GLOBAL CONTINUUM FUND, LTD; | § | Consolidated C.A. No. 9322-VCL |
| SPECTRUM OPPORTUNITIES MASTER | § | |
| FUND LTD.; MORGAN STANLEY | § | |
| DEFINED CONTRIBUTION MASTER | § | |
| TRUST; BLACKWELL PARTNERS LLC; | § | |
| AAMAF, LP; WAKEFIELD PARTNERS, | § | |
| LP; CSS, LLC; MERLIN PARTNERS, LP; | § | |
| WILLIAM L. MARTIN; TERENCE | § | |
| LALLY; ARTHUR H. BURNET; | § | |
| DARSHANAND KHUSIAL; DONNA H. | § | |
| LINDSEY; DOUGLAS J. JOSEPH ROTH | § | |
| CONTRIBUTORY IRA; DOUGLAS J. | § | |
| JOSEPH & THUY JOSEPH, JOINT | § | |
| TENANTS; GEOFFREY STERN; JAMES | § | |
| C. ARAMAYO; THOMAS RUEGG; | § | |
| CAVAN PARTNERS LP; and RENE A. | § | |
| BAKER, | § | |
| | § | |
| Petitioners-Below, | § | |
| Appellees/Cross-Appellants. | § | |

Submitted: September 27, 2017
Decided: December 14, 2017

Before **STRINE**, Chief Justice; **VALIHURA**, **VAUGHN**, and **TRAYNOR**, Justices; and **LeGROW**, Judge * constituting the Court *en Banc*.

Upon appeal from the Court of Chancery.   **REVERSED** in part, **AFFIRMED** in part, and **REMANDED**.

Gregory P. Williams, Esquire (*argued*), John D. Hendershot, Esquire, Susan M. Hannigan, Esquire, and Andrew J. Peach, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware.  Of Counsel:  John L. Latham, Esquire, and Susan E. Hurd, Esquire, Alston & Bird LLP, Atlanta, Georgia; Gidon M. Caine, Esquire, Alston & Bird LLP, East Palo Alto, California; and Charles W. Cox, Esquire, Alston & Bird LLP, Los Angeles, California, for Appellant/Cross-Appellee *Dell Inc*.

Stuart M. Grant, Esquire (*argued*), Michael J. Barry, Esquire, Christine M. Mackintosh, Esquire, and Rebecca A. Musarra, Esquire, Grant & Eisenhofer P.A., Wilmington, Delaware, for Appellees/Cross-Appellants *Morgan Stanley Defined Contribution Master Trust; AAMAF, LP; CSS, LLC; Merlin Partners, LP; William L. Martin; Terence Lally; Arthur H. Burnet; Darshanand Khusial; Donna H. Lindsey; Douglas J. Joseph Roth Contributory IRA; Douglas J. Joseph & Thuy Joseph, Joint Tenants; Geoffrey Stern; James C. Aramayo; Thomas Ruegg; and Rene A. Baker*.

Samuel T. Hirzel, II, Esquire (*argued*), and Melissa N. Donimirski, Esquire, Heyman Enerio Gattuso & Hirzel LLP, Wilmington, Delaware.  Of Counsel:  Lawrence M. Rolnick, Esquire, and Steven M. Hecht, Esquire, Lowenstein Sandler LLP, New York, New York, for Appellees/Cross-Appellants *Magnetar Global Event Driven Master Fund Ltd; Magnetar Capital Master Fund Ltd; Global Continuum Fund Ltd; Spectrum Opportunities Master Fund Ltd; Blackwell Partners LLC; and Wakefield Partners LP*.

**VALIHURA**, Justice:

---

* Sitting by designation pursuant to Del. Const. art. IV § 12.

The petitioners left standing in this long-running appraisal saga are former stockholders of Dell Inc. ("Dell" or the "Company") who validly exercised their appraisal rights instead of voting for a buyout led by the Company's founder and CEO, Michael Dell, and affiliates of a private equity firm, Silver Lake Partners ("Silver Lake"). In perfecting their appraisal rights, petitioners acted on their belief that Dell's shares were worth more than the deal price of $13.75 per share—which was already a 37% premium to the Company's ninety-day-average unaffected stock price.

Our appraisal statute, 8 *Del. C.* § 262, allows stockholders who perfect their appraisal rights to receive "fair value" for their shares as of the merger date instead of the merger consideration. The appraisal statute requires the Court of Chancery to assess the "fair value" of such shares and, in doing so, "take into account all relevant factors." The trial court complied: it took into account all the relevant factors presented by the parties in advocating for their view of fair value—including Dell's stock price and deal price—and then arrived at its own determination of fair value.

The problem with the trial court's opinion is not, as the Company argues, that it failed to take into account the stock price and deal price. The trial court *did consider* this market data. It simply decided to give it no weight. But the court nonetheless erred because its reasons for giving that data no weight—and for relying instead exclusively on its own discounted cash flow ("DCF") analysis to reach a fair value calculation of $17.62—do not follow from the court's key factual findings and from relevant, accepted financial principles.

1

"When reviewing a decision in a statutory appraisal, we use an abuse of discretion standard and grant significant deference to the factual findings of the trial court. This Court 'will accept [the Court of Chancery's] findings if supported by the record . . . .'"[1] We defer to the trial court's fair value determination if it has a "reasonable basis in the record and in accepted financial principles relevant to determining the value of corporations and their stock."[2]

Here, the trial court gave no weight to Dell's stock price because it found its market to be inefficient. But the evidence suggests that the market for Dell's shares was actually efficient and, therefore, likely a possible proxy for fair value. Further, the trial court concluded that several features of management-led buyout ("MBO") transactions render the deal prices resulting from such transactions unreliable. But the trial court's own findings suggest that, even though this was an MBO transaction, these features were largely absent here. Moreover, even if it were not possible to determine the precise amount of that market data's imperfection, as the Court of Chancery concluded, the trial court's decision to rely "exclusively" on its own DCF analysis[3] is based on several assumptions that are not grounded in relevant, accepted financial principles.

---

[1] *DFC Global Corp. v. Muirfield Value Partners*, --- A.3d ----, 2017 WL 3261190, at *12 (Del. Aug. 1, 2017) (quoting *In re Shell Oil Co.*, 607 A.2d 1213, 1219 (Del. 1992)); *see also M.G. Bancorp., Inc. v. Le Beau*, 737 A.2d 513, 526 (Del. 1999) ("The Court of Chancery abuses its discretion when either its factual findings do not have record support or its valuation is not the result of an orderly and logical deductive process.").

[2] *DFC*, 2017 WL 3261190, at *1.

[3] *In re Appraisal of Dell* (*Dell Trial Fair Value*), 2016 WL 3186538, at *51 (Del. Ch. May 31, 2016).

We REVERSE, in part, and AFFIRM, in part, and REMAND for these reasons and those that follow. In addition, for reasons discussed in Section IV, we REVERSE and REMAND the Court of Chancery's decision concerning the allocation of fees and costs among the appraisal class.

## I.

### *A. Dell*

In June 2012, when the idea of an MBO first arose, Dell was a mature company on the brink of crisis: its stock price had dropped from $18 per share to around $12 per share in just the first half of the year. The advent of new technologies such as tablet computers crippled the traditional PC-maker's outlook. The Company's recent transformation struggled to generate investor optimism about its long-term prospects. And the global economy was still hungover from the financial crisis of 2008.

Other than a brief hiatus from 2004 to his return in 2007, Michael Dell had led Dell as CEO, from the Company's founding in his first-year dorm room at the University of Texas at Austin when he was just nineteen years old, to a Fortune 500 behemoth with

global revenues hitting $56.9 billion in the fiscal year ending February 1, 2013.[4] Dell was indisputably one of the world's largest IT companies.[5]

### i.    Michael Dell's Return and the Company's Challenges

Upon his return to the Company in 2007, Mr. Dell[6] perceived three key challenges facing Dell. First, low-margin PC-makers such as Lenovo were muscling into Dell's market share as the performance gap between its higher-end computers and the cheaper alternatives narrowed. Second, starting with the launch of Apple's iPhone in 2007, the impending onslaught of smartphones and tablet computers appeared likely to erode traditional PC sales. Third, cloud-based storage from the likes of Amazon.com threatened the Company's traditional server storage business.

In light of these threats, Mr. Dell believed that, to survive and thrive, the Company should focus on enterprise software and services, which could be accomplished through acquisitions in these spaces. From 2010 through 2012, the Company acquired eleven companies for approximately $14 billion. And Mr. Dell tried to sell the market on this transformation. He regularly shared with equity analysts his view that the Company's

---

[4] *Id.* at *1; Revised Expert Report of Glenn Hubbard (Sept. 29, 2015), at A3262 [hereinafter Dell's Valuation Expert Report]. In general, citations to the record have been shortened to a short name of the document, "at," and the appendix page number. Page numbers beginning with "A" refer to the Appendix to the Appellant's Opening Brief; page numbers beginning with "B" refer to the Appendix to the Appellees/Cross-Appellants' Answering Brief and Opening Brief on Cross-Appeal; page numbers beginning with "AR" refer to the Appendix to Appellant's Reply Brief on Appeal and Cross-Appellee's Answering Brief on Cross-Appeal.

[5] Dell's Valuation Expert Report, *supra* note 4, at A3262.

[6] As the Court of Chancery did in its opinion, we use the honorific "Mr. Dell" to distinguish Michael Dell from Dell, the company.

enterprise solutions and services divisions would achieve annual sales growth in the double-digits and account for more than half of Dell's profits by 2016.

Yet despite Dell's M&A spurt and Mr. Dell's attempts to persuade Wall Street to buy into the Company's future, the market still "didn't get" Dell, as Mr. Dell lamented.[7] It still viewed the Company as a PC business, and its stock hovered in the mid-teens.

### ii. The Market for Dell's Stock

Dell's stock traded on the NASDAQ under the ticker symbol DELL. The Company's market capitalization of more than $20 billion ranked it in the top third of the S&P 500.[8] Dell had a deep public float[9] and was actively traded as more than 5% of Dell's shares were traded each week.[10] The stock had a bid-ask spread of approximately 0.08%.[11] It was also widely covered by equity analysts,[12] and its share price quickly reflected the

---

[7] *Dell Trial Fair Value*, 2016 WL 3186538, at *2.

[8] Dell's Valuation Expert Report, *supra* note 4, at A3285. *See also* Revised Expert Report of Bradford Cornell (Sept. 27, 2015), at A3527 (noting Dell's pre-announcement market capitalization was $18.902 billion).

[9] As of August 3, 2012, Dell approximated the aggregate market value of its common stock held by non-affiliates to be $17.1 billion. Dell Form 10-K for FY 2013 (Mar. 12, 2013), at A1967 [hereinafter Form 10-K 2013]. The public float was 84.29% in 2012. *See* Dell's Valuation Expert Report, *supra* note 4, at A3423. At the time of the transaction, Dell had 1,765,369,276 publicly traded shares outstanding. *Dell Trial Fair Value*, 2016 WL 3186538, at *51.

[10] *See, e.g.*, Dell's Valuation Expert Report, *supra* note 4, at A3285-86, A3423 (noting that Dell's average weekly trading volume was 5.52% of its shares in 2012); 5 Alan R. Bromberg, Lewis D. Lowenfels & Michael J. Sullivan, *Bromberg & Lowenfels on Securities Fraud* § 7:484 (2d ed. June 2017 Update) ("Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one.").

[11] Dell's Valuation Expert Report, *supra* note 4, at A3286, A3423.

[12] *See, e.g.*, JPMorgan Presentation to the Denali Special Committee (Oct. 9, 2012), at A1572 (noting that, as of October 9, 2012, thirty-three research analysts were covering Dell).

market's view on breaking developments.[13] Based on these metrics, the record suggests the market for Dell stock was semi-strong efficient, meaning that the market's digestion and assessment of all publicly available information concerning Dell was quickly impounded into the Company's stock price.[14] For example, on January 14, 2013, Dell's stock jumped 9.8% within a minute of Bloomberg breaking the news of the Company's take-private talks, and the stock closed up 13% from the day prior—on a day the S&P 500 as a whole fell 0.1%.[15]

## B. The Sale Process

The first inkling of a Dell MBO can be traced to June 2012, when private equity executive Staley Cates of Southeastern Asset Management suggested to Mr. Dell that he might consider taking the Company private.[16] Mr. Dell was intrigued as he believed it would be easier to execute the Company's transformation plan unencumbered by stockholder pressure.[17] However, the Company's financial advisor, Goldman Sachs, warned that an MBO would be too difficult to pull off.[18] But after Silver Lake's Egon Durban also proposed the idea of an MBO that August, Mr. Dell enlisted the advice of

---

[13] Dell's Valuation Expert Report, *supra* note 4, at A3304-06.

[14] *Id.* at A3263, A3285-86.

[15] *Id.* at A3305-06.

[16] *Dell Trial Fair Value*, 2016 WL 3186538, at *2.

[17] Transcript of Michael Dell Deposition (May 14, 2015), at B1459-60 [hereinafter M. Dell Deposition].

[18] Transcript of Michael Dell Trial Testimony (Oct. 6, 2015), at A582 [hereinafter M. Dell Testimony]; M. Dell Deposition, *supra* note 17, at B1459.

friend and private equity executive George Roberts of Kohlberg Kravis Roberts & Co. L.P. ("KKR").[19] This time, he received positive feedback, including an indication that KKR might be interested in participating should the Company go that route.[20] Mr. Dell then brought the idea to Dell's Board by calling the Company's lead independent director, Alex Mandl, on Friday, August 14, 2012.[21]

The following Monday, the Board met and created an independent special committee composed of four independent directors (the "Committee") to evaluate possible transactions to acquire the Company proposed by Mr. Dell and/or any other party, as well as to explore possible strategic alternatives. The Board empowered the Committee to hire its own legal and financial advisors, and the Committee selected Debevoise & Plimpton LLP as legal counsel and JP Morgan Chase & Co. as financial advisor. (The Committee eventually hired Evercore Partners as a second financial advisor in January 2013.) The Committee also had full and exclusive authority to recommend to the Board a course of action regarding any proposed transaction, and the Board vowed not to recommend that stockholders approve a transaction without receiving a prior favorable recommendation from the Committee.

Dell's earnings for the second quarter of Fiscal 2013, announced the following day, August 21, 2012, underscored the Company's challenges: revenue was down 8% from the

---

[19] *Dell Trial Fair Value*, 2016 WL 3186538, at *2.

[20] *Id.*

[21] *Id.*

7

prior year, and earnings per share dropped 13%. The Company's revenue fell short of expectations, and its management further revised its EPS forecast down 20% for Fiscal 2013. Dell management said that the Company was amid a "long-term strategy" expected to "take time" to reap benefits.[22] But one analyst called the Company a "sinking ship" and emphasized that "Dell's turnaround strategy is fundamentally flawed [and] the fundamentals are bad. Dell may have responded too late to save itself."[23] Many analysts also revised their price targets downward.

### i.    The Pre-Signing Canvass

The following month, September, after entering into confidentiality agreements with the Committee, Silver Lake and KKR began evaluating Dell's proprietary data, including management projections.

Mr. Dell, who owned 13.9% of the Company's outstanding shares as of August 2012 and 15.4% as of September 2012, also entered into a confidentiality agreement. Mr. Dell's confidentiality agreement required him to, among other things, "explore in good faith the possibility of working with any such potential counterparty or financing source if requested by the Committee," a provision designed to prevent his prior involvement with KKR and Silver Lake from deterring other possible bidders.[24]

---

[22] *Id.* at *4.

[23] *Id.*

[24] *Id.* at *5.

8

After consulting with JPMorgan, the Committee decided to limit its initial pre-signing market canvass to KKR and Silver Lake because they were, according to JPMorgan, "among the best qualified potential acquirers," and "there was a low probability of strategic buyer interest in acquiring the Company."[25] Using management forecasts that the Committee still considered "overly optimistic,"[26] on October 9, 2012, the day after the Company's stock price closed at $9.66 per share, JPMorgan shared with the Committee that it believed a financial sponsor could pay approximately $14.13 per share and still obtain an internal rate of return ("IRR") of a level that could attract private equity buyers such as KKR and Silver Lake, a five-year IRR of 20% per share.[27] At several Committee meetings that fall, JPMorgan and the Company's bankers from Goldman Sachs shared a range of valuations for various transaction scenarios, including Goldman's projections for the Company's future share prices if Dell remained a standalone public Company.[28]

On October 23, 2012, a day on which Dell's stock price was to close at $9.35, both KKR and Silver Lake proposed transactions to the Committee. KKR indicated its interest in an all-cash transaction at between $12.00 and $13.00 per share, excluding Mr. Dell's and Southeastern's shares. Under KKR's proposal, Mr. Dell was to invest an additional

---

[25] *Id.* at *6.

[26] *Id.*

[27] *Id.* at *6-7.

[28] *See id.* at *6 ("On October 9, 2012, the Committee received a presentation from JPMorgan that provided a preliminary assessment of the Company's value as a standalone entity."); *id.* at *7 ("Goldman observed that '[i]llustrative standalone valuation analyses result in [Company] value outcomes that are significantly higher than the current share price.'"). However, Goldman Sachs's preliminary report relied on management's "September Case" projections considered overly optimistic. *See id.*

9

$500 million in the Company. Silver Lake proposed an all-cash transaction at between $11.22 and $12.16 per share, excluding Mr. Dell's shares.

But, as JPMorgan observed when reviewing these proposals with the Committee, these expressions of interest undershot the $14.13 per share that it believed a financial sponsor could pay. The Committee asked Mr. Dell to email both firms to encourage them to raise their offers, and he obliged—sending the same email to each in which he offered for Company management to meet with representatives of each firm and solicited their advice on what the Company could do to help improve their proposals.[29]

But the Company's third-quarter earnings, released on November 15, 2012, brought more bad news for Dell: revenue dropped 11% from the prior year, and EPS was down 28%. During this period when Dell was trying to sell its long-term vision without success, it kept failing the quarterly tests on which so many market analysts focus. By way of example, this was the sixth of the past seven quarters that revenue fell below consensus estimates. As research analysts lowered their price targets out of concern for the future of the PC industry and growing skepticism about Dell's turnaround strategy, even CFO Brian Gladden acknowledged that "[m]anagement projections appear optimistic given valuation & sell-side estimates of Dell future value."[30] The Committee enlisted Boston Consulting Group ("BCG") to formulate independent projections for the Company.

---

[29] *Id.* at *8.

[30] *Id.*

By December 3, 2012, KKR withdrew its proposal as it was unable to "get [its] arms around the risks of the PC business."[31]

For his part, Mr. Dell remained open "to join up with whoever" and was willing to supply as much equity as necessary for a transaction.[32] To restore competition to the process once KKR dropped out, the Committee asked another PE heavyweight, Texas Pacific Group ("TPG"), who had recently invested in Dell's down-market rival Lenovo, to explore an acquisition.[33] Though TPG signed a confidentiality agreement, obtained access to the data room, "spent a good deal of resources on it,"[34] and its leaders sat through presentations by Dell management, the PE firm reported to the Committee on December 23, 2012, that it decided not to submit a bid as "cash flows attached to the PC business were simply too uncertain, too unpredictable to establish an investment case."[35]

By January 24, 2013, three additional parties had expressed a desire to explore a deal. GE Capital, a "strategic party," told Evercore that it was interested in buying the Dell Financial Services business for approximately the book value of its assets, between $3.5 and $4 billion.[36] Blackstone also called Evercore with a heads-up that it anticipated exploring a Dell deal during the go-shop and "seeking assurances that any definitive

---

[31] *Id.*

[32] *Id.*

[33] *Id.* at *9.

[34] Transcript of Alex Mandl Trial Testimony (Oct. 5, 2015), at A314 [hereinafter Mandl Testimony].

[35] *Dell Trial Fair Value*, 2016 WL 3186538, at *9-10.

[36] Minutes of Special Committee Meeting (Jan. 24, 2013), at A1639-40.

agreement the Company may be considering entering into would provide for a meaningful go-shop process."[37] Last, Southeastern sought to enter into a confidentiality agreement and start reviewing the Company's confidential information.[38]

News that Dell was exploring a strategic transaction had been leaking out since December, and Evercore reasoned that "if there were any people out there who were actively interested, there was a good chance they would have already come forward."[39]

For its part, Silver Lake remained interested in a deal through it all. Over the course of negotiations, the Committee persuaded Silver Lake to raise its offer six times from its initial proposal of $11.22-to-$12.16 per share.[40] It helped that, after the Board resolved to seek $13.75 per share and settle for no less than $13.60 per share, Mr. Dell agreed to accept a lower price to roll over his shares than unaffiliated stockholders were to receive. On February 3, Silver Lake presented the Committee two options greater than its existing $13.50 per share offer: either (i) $13.60 per share if it allowed the Company to continue its regular quarterly dividend payment through closing, or (ii) $13.75 all-cash with no

---

[37] *Id.* at A1640. The Court of Chancery opinion notes that Evercore's engagement with the Committee promised it a contingency fee if and only if a deal surfaced during the go-shop and, as such, it suggested that Evercore advised the Committee to delay negotiations with Blackstone until the go-shop due to the incentives of its own compensation arrangement. *See Dell Trial Fair Value*, 2016 WL 3186538, at *11. But other evidence in the record suggests that Blackstone proposed waiting until the go-shop on its own. *See* Transcript of William Hiltz Trial Testimony (Oct. 6, 2015), at A517 [hereinafter Hiltz Testimony]; Minutes of Special Committee Meeting (Jan. 24, 2013), at A1640.

[38] *Id.*

[39] Hiltz Testimony, *supra* note 37, at A516.

[40] Schedule 14A (May 31, 2013), at 27 (A2199), 30 (A2202), 37-38 (A2209-10), 41 (A2213) [hereinafter Proxy].

12

additional dividends. After the Committee told Silver Lake that $13.60 would not suffice under the first alternative, Silver Lake boosted the cash component to $13.65 per share on February 4, its "best and final offer."[41]

The Committee met with its financial advisors on the afternoon of February 4: both Evercore and JPMorgan indicated that they considered $13.65 per share fair to the unaffiliated stockholders from a financial point of view.[42] The Committee recommended that the Board accept Silver Lake's offer, and, aside from Mr. Dell, who was not present, the Board unanimously adopted resolutions approving the transaction.[43] The next morning, February 5, 2013, the Company and three entities affiliated with Silver Lake and Mr. Dell (collectively the "Buyout Group") entered into the merger agreement dated February 5, 2013 (collectively with amendments, the "Merger Agreement"), and they publicly announced the planned transaction.[44]

Mr. Dell signed a voting agreement wherein he pledged that he and his affiliates would vote their shares in proportion to the number of unaffiliated shares that vote for either (i) a "Superior Proposal" as defined in the Merger Agreement which, if available, would terminate the Merger Agreement; or (ii) the adoption of the Merger Agreement if the Board changed its recommendation.[45] This meant that any outside bidder who

---

[41] *Dell Trial Fair Value*, 2016 WL 3186538, at *12.

[42] *Id.*; Proxy, *supra* note 40, at 41-42 (A2213-14), 60 (A2232).

[43] *Id.* at 42 (A2214).

[44] *Id.* at 43 (A2215); Merger Agreement at Proxy Annex A (A2364-2437).

[45] *Dell Trial Fair Value*, 2016 WL 3186538, at *12.

persuaded stockholders that its bid was better would have access to Mr. Dell's votes, eliminating one of the key problems other bidders may face when there is a CEO with material voting power.

The transaction contemplated that Mr. Dell would roll over his shares at $13.36 per share and invest up to $500 million in additional equity and that an affiliate of his would invest up to $250 million in additional equity. This transaction structure would give Mr. Dell a 74.9% stake in the Company post-closing, and Silver Lake a 25.1% stake.

The Merger Agreement also provided for a forty-five-day go-shop period ending March 23, 2013; a one-time match right for the Buyout Group available until the stockholder vote; and termination fees of $180 million if the Company agreed to a Superior Proposal as defined in the Merger Agreement that materialized during the go-shop period, or $450 million if the Company agreed to a non-Superior Proposal or to bids produced after the go-shop period.

*ii.  The Go-Shop Period*

Led by Evercore, the go-shop period began on February 5, 2013. Within ten days, Evercore had surveyed the interest of sixty parties, including Blackstone and Hewlett-Packard ("HP"), the two parties that Evercore had identified as Dell's top prospects for a deal aside from the Buyout Group.

As the Company's closest competitor, HP appeared the natural strategic partner for a deal. Though Evercore told HP that a deal with Dell could realize between $3 and 4 billion in annual cost savings through synergies and HP signed a confidentiality agreement, HP's representatives never logged into the data room.

14

The Company received its first non-binding proposal of the go-shop period on March 5, 2013, when Carl Icahn of Icahn Enterprises L.P. ("Icahn") wrote a letter to the Board opposing the MBO as announced and proposing a leveraged recapitalization instead. After signing a confidentiality agreement, Icahn accessed the data room on March 11.

On March 21, 2013, GE Capital again offered to purchase the Company's financial services business, this time for $3.6 billion in cash, and said that it was willing to allow the Committee to consider its proposal in conjunction with any other bid.

The next day, Icahn submitted a revised non-binding proposal that was to allow stockholders to choose between either (i) rolling over their shares into a new entity one-to-one, or (ii) receiving $15.00 per share in cash up to $15.6 billion in total cash payments. Under this plan, if more stockholders requested cash than available under the $15.6 billion cap, the $15.6 billion would be distributed *pro rata* among all those stockholders requesting cash. Evercore valued this proposal at between $13.37 and $14.42 per share.

That day, March 22, 2013, Blackstone and a group of other possible investors also submitted a non-binding proposal that involved a choice: existing Dell stockholders could receive $14.25 per share in cash *or* stock in a new entity valued at $14.25 capped at the total amount of equity issued by the new entity. Evercore and JPMorgan each said this proposal was worth $14.25 per share.

By the time the go-shop period ended on March 23, Evercore had contacted sixty-seven parties, including twenty potential strategic buyers and seventeen financial sponsors,

15

about their interest in a transaction involving Dell.[46] Evercore also received unsolicited inquiries from two strategic parties and two financial sponsors.[47]

Mr. Dell was available to all parties throughout the go-shop period. Though Mr. Dell wanted to go on a two-week vacation that spring, Evercore insisted that he stay given that he "wasn't unavailable to Silver Lake at any point during their final 2 pre-offer weeks."[48]

### C. After the Go-Shop

Because the Icahn and Blackstone proposals could both potentially lead to Superior Proposals under the Merger Agreement, they qualified as Excluded Parties, which meant Dell would only have to pay a $180 million termination fee if it chose to forego the Silver Lake deal.

Blackstone said that it would continue exploring a transaction only if Dell reimbursed it for its out-of-pocket due diligence expenses. To avoid inadvertently breaching the Merger Agreement, which would allow the Buyout Group to revoke its offer, the Committee sought Silver Lake's consent. Silver Lake agreed on the condition that it, too, receive payment for such expenses. The Committee agreed to reimburse both Blackstone and Silver Lake for up to $25 million of due diligence costs.

---

[46] Proxy, *supra* note 40, at 43 (A2215).

[47] *Id.*

[48] *Dell Trial Fair Value*, 2016 WL 3186538, at *14.

Icahn sought the same arrangement for his firm while it was negotiating over a waiver of the limitations on deals with interested stockholders under 8 *Del. C.* § 203. Concerned that Icahn might become hostile, the Committee agreed to extend the same expense reimbursement to Icahn as long as he signed a standstill.[49]

Mr. Dell did not let his initial alliance with Silver Lake impede his willingness to explore a future with Blackstone. An email from Mr. Dell to Blackstone from that period shows that Mr. Dell felt that Blackstone "substantially" agreed with his vision for the Company and that Mr. Dell was "open to considering all alternatives."[50] But Blackstone's actions also suggested that its interest was not founded—and that a deal would not hinge— on Mr. Dell's continued involvement in the Company: Reuters reported that Blackstone was reviewing candidates to replace him as CEO.[51]

Blackstone charged David Johnson, who had just joined the PE firm from his job as Dell's head of acquisitions that January, with leading its diligence operation: more than 460 people combed through the virtual data room, and approximately forty Blackstone employees took over a Texas ballroom for additional on-the-ground diligence alongside twenty Dell employees. From Dell's side, Mr. Dell attested that he "spent more time with Blackstone than any of the other participants."[52] Overall, Dell's whole management team

---

[49] *Id.* at *15. Icahn agreed to these terms. *See* Proxy, *supra* note 40, at 49 (A2221).

[50] *Dell Trial Fair Value*, 2016 WL 3186538, at *15.

[51] *See id.*

[52] *Id.*

spent more time with Blackstone representatives than with those from any other prospective investor, including Silver Lake.

But this diligence operation ultimately led Blackstone to back down. It withdrew from the bidding on April 18, 2013, and cited two key reasons for its decision: "(1) an unprecedented 14 percent market decline in PC volume in the first quarter of 2013, its steepest drop in history, and inconsistent with Management's projections for modest industry growth; and (2) the rapidly eroding financial profile of Dell."[53] For instance, Blackstone noted that, since Blackstone's initial bid on March 22, Dell revised its operating income projections downward by $700 million (from $3.7 billion to $3 billion).

But Icahn remained interested and, on May 8, 2013, his firm teamed up with Cates's Southeastern to propose a modified recapitalization plan that would allow existing stockholders to keep their shares and have the option to choose to receive either (i) $12.00 in cash per share, or (ii) $12.00 worth of new shares of stock valued at $1.65 per share. Evercore did not think the Icahn-Southeastern plan could qualify as a Superior Proposal under the Merger Agreement given that it contemplated strictly a leveraged recapitalization.[54]

Meanwhile, the Company's first quarter results for Fiscal 2014, released May 16, 2013, still failed to demonstrate that Dell's turnaround strategy had legs as net income fell 79% from the previous year, and GAAP earnings per share were down 81%. Bernstein

---

[53] *Id.*

[54] *Id.* at *16.

Research highlighted that Dell's enterprise solutions and services segment had "woeful" margins, "well below industry peers."[55] The Company's CFO Brian Gladden did not object to that assessment and wrote in an email to Dell's senior leadership team that they needed to have "some very serious conversations . . . about the trajectory of the business and our growth/profitability plans. It's not apparent that the shift to growth will bring profit and cash in the short or long term . . . . We cannot support the current opex [operating expense] structure with these results."[56]

### i. Dueling Proposals Ahead of Stockholder Vote

The Board arranged for a stockholder vote on the merger to occur at a special meeting on July 18, 2013. The definitive proxy statement filed May 31, 2013, explained that the Committee decided to recommend the transaction with Silver Lake as fair to unaffiliated stockholders because it involved, among other things: (i) the certainty of cash consideration; (ii) a 37% premium over the Company's ninety-day-average unaffected trading price of $9.97; and (iii) a 25% premium over its one-day unaffected trading price of $10.88.[57] In evaluating the transaction's fairness, the Committee "believ[ed] that the trading price of the Common Stock at any given time represent[ed] the best available indicator of the Company's going concern value at that time, so long as the trading price

---

[55] *Id.*

[56] *Id.*; Email from B. Gladden to J. Clarke et. al. re: 1Q summary (May 17, 2013), at B724.

[57] Proxy, *supra* note 40, at 55 (A2227).

at that time is not impacted by speculation regarding the likelihood of a potential transaction."[58]

But Icahn was still in the hunt: he filed his preliminary proxy statement on June 6; disclosed on June 18 that he and affiliates had purchased seventy-two million shares from Southeastern at $13.52 per share; and advised Dell stockholders in writing on June 19 that he planned to nominate his own slate of directors who would scrap the transaction with the Buyout Group and instead launch a self-tender for 1.1 billion shares at $14 per share. Icahn vowed not to tender his shares. On July 1, Icahn revealed to the Committee and the Company's stockholders that lenders had committed $5.2 billion to finance the partial tender offer proposal.

After the leading proxy advisory firms recommended that stockholders approve the MBO, Icahn revised his proposal on July 12 to add one warrant for every four shares tendered. Each warrant would entitle the holder for a period of seven years to purchase one share of the Company's common stock for $20.

On July 17, the day before the vote, the Committee's proxy solicitor informed it that the Company's stockholders were unlikely to approve the merger. To avoid defeat, the Committee convened the meeting and adjourned it without holding a vote, affording the Buyout Group time to improve its proposal.

The Buyout Group initially proposed adding $0.10 per share to the merger consideration in exchange for reducing the number of stockholders needed to approve the

---

[58] *Id.* at 60 (A2232).

merger, from the majority of all unaffiliated stockholders to simply the majority of those unaffiliated stockholders present at the meeting or who vote by proxy. But the Committee rejected this adjustment on July 30, sending the Company's stock price down 2.55%.

The next day, the Buyout Group sweetened the deal for lowering the threshold for approving the deal: in addition to the ten-cent bump that brought the merger consideration to $13.75, the Buyout Group promised a special cash dividend of $0.08 per share; vowed to pay a third-quarter dividend of $0.08 no matter the closing date; and agreed to accept a reduced termination fee of $180 million instead of $450 million if the stockholders rejected the merger in favor of a leveraged recapitalization or similar proposal in the next twelve months. After the Committee insisted that it would not accept the deal unless the special cash dividend increased to $0.13, the Buyout Group agreed, bringing the total value of the deal to $13.96 per share. (To finance the adjustment, Mr. Dell agreed to receive $12.51 instead of $13.36 for his rollover shares.)

When the Committee met to evaluate the revised proposal on August 2, 2013, both Evercore and JPMorgan determined the $13.75 per share deal price to be fair to the unaffiliated stockholders. Following the Committee's advice, the Board approved the revised transaction (hereinafter, the "Merger") and amended the Merger Agreement to reflect the changed deal terms. A vote was scheduled for September 12, 2013.

21

### ii. Stockholder Vote

At the special meeting held September 12, 2013, 57% of all Dell shares approved the Merger (70% of the shares present at the meeting). The Merger closed October 29, 2013, and the shares of non-dissenting Dell stockholders were converted into $13.75 per share in cash. Though Icahn and Southeastern initially indicated that they would seek appraisal if the Merger were approved, they withdrew their demands. However, holders of 38,765,130 shares of Dell common stock demanded appraisal.[59]

### D. The Appraisal Trial

The four-day appraisal trial in October 2015 featured 1,200 exhibits, seventeen depositions, live testimony from seven fact witnesses and five expert witnesses, a 542-paragraph-long pre-trial order, and 369 pages of pre- and post-trial briefing. Petitioners argued that, as demonstrated through their expert's DCF analysis, the fair value of the Company's common stock at the effective time of the Merger was actually $28.61 per share—more than double the deal price of $13.75. If this valuation were correct, the Buyout Group obtained Dell at a $26 billion discount to its actual value. In contrast, Dell maintained that its DCF analysis yielding a $12.68 per share valuation was a more appropriate approximation of fair value, but that, in light of the uncertainties facing the PC industry, fair value could be as high as the deal price (but not greater).

---

[59] *In re Appraisal of Dell* (*Dell Fees & Expenses*), 2016 WL 6069017, at *1 (Del. Ch. Oct. 17, 2016).

## E. The Court of Chancery's Determination of Fair Value

The Court of Chancery acknowledged that "[t]he consideration that the buyer agrees to provide in the deal and that the seller agrees to accept is one form of market price data, which Delaware courts have long considered in appraisal proceedings."[60] However, the court believed that flaws in Dell's sale process meant that the deal price of $13.75 should not be afforded any weight here since it was "not the best evidence of [the Company's] fair value."[61] Accordingly, the trial court disregarded both Dell's pre-transactional stock price and the deal price entirely.

The Court of Chancery identified three crucial problems with the pre-signing phase of the sale process that contributed to its decision to disregard the market-based indicators of value.

First, the primary bidders were all financial sponsors who used an LBO pricing model to determine their bid prices—meaning that the per-share deal price needed to be low enough to facilitate an IRR of approximately 20%. As the court saw it, the prospective PE buyers, the Buyout Group, Mr. Dell, and the Committee never focused on determining the intrinsic value of the Company as a going concern.

Second, the trial court believed that Dell's investors were overwhelmingly focused on short-term profit, and that this "investor myopia" created a valuation gap that purportedly distorted the original merger consideration of $13.65. Thus, under the Court

---

[60] *Dell Trial Fair Value*, 2016 WL 3186538, at *22.

[61] *Id.* at *22, *29.

of Chancery's logic, the efficient market hypothesis—which teaches that the price of a company's stock reflects all publicly available information as a consensus, per-share valuation—failed when it came to Dell, diminishing the probative value of the stock price. This phenomenon also allegedly depressed the deal price by anchoring deal negotiations at an improperly low starting point.[62]

Third, the trial court concluded that there was no meaningful price competition during the pre-signing phase as, at any given time during the pre-signing phase, there were at most two private equity sponsors competing for the deal, creating little incentive to bid up the deal price. The trial court especially faulted the Committee for declining to reach out to potential strategic bidders, such as HP, during the pre-signing phase, leaving the financial sponsors who were engaged without the incentive "to push their prices upward to pre-empt potential interest from that direction."[63] According to the trial court, large private equity buyers such as those engaged here are notoriously averse to topping each other, and without the specter of a strategic buyer, the Committee lacked "the most powerful tool that a seller can use to extract a portion of the bidder's anticipated surplus"—the "threat of an alternative deal."[64]

Next, the trial court evaluated the post-signing go-shop process, where it identified several additional issues that it believed further contributed to a deal price that fell short of fair value. Though two additional proposals to acquire the Company emerged during the

---

[62] *Id.* at *33-36.

[63] *Id.* at *37.

[64] *Id.*

go-shop period, from Blackstone and Icahn, the trial court dismissed their import given that these prospective buyers also operated within the "confines of the LBO model," and that the deal price ultimately increased by just 2% over the original merger consideration of $13.65 per share as a result of this go-shop.

Further, the trial court observed that the deal's structure as an MBO imposed several additional, supposedly insurmountable impediments to Dell's ability to prove at trial that the deal's "structure in fact generated a price that persuasively established the Company's fair value."[65] The trial court emphasized that, to prove a go-shop's worth, it is crucial to show that prospective rival bidders had a "realistic pathway to success" so as to justify the time, expense, and harm to professional relationships that might result from pursuing an offer.[66] Though the trial court recognized that the "relatively open" structure of the Committee's go-shop "raised fewer structural barriers than the norm,"[67] the court believed such openness could not obviate the issues imposed by features "endemic to MBO go-shops," which "create a powerful disincentive for any competing bidder—and particularly competing financial bidders—to get involved."[68] These features include a so-called "winner's curse" and the management team's inherent value to the Company.[69]

---

[65] *Id.* at *39.

[66] *Id.*

[67] *Id.* at *40.

[68] *Id.* at *43.

[69] *Id.*

The concept of a "winner's curse" reflects the notion that "incumbent management has the best insight into the Company's value, or at least is perceived to have an informational advantage," so if a financial buyer is willing to outspend management to win a deal, it must be overpaying because it must have overlooked some piece of information that dissuaded management from bidding as much.[70] Further, the trial court inferred that "Mr. Dell's unique value and his affiliation with the Buyout Group were negative factors that inhibited the effectiveness of the go-shop process,"[71] despite evidence that suggested that neither Blackstone nor Icahn—nor anyone else, for that matter—believed that Mr. Dell's continued involvement with the Company was essential. Moreover, Mr. Dell appeared willing to work with any viable party.[72]

In light of these apparent flaws in the sale process, both pre- and post-signing, the trial court found that the Company failed to establish that "the sale process offers the most reliable evidence of the Company's value as a going concern."[73] Moreover, the Court of Chancery decided that "[b]ecause it is impossible to quantify the exact degree of the sale process mispricing," it was going to discount the final merger consideration of $13.75 entirely—giving it no weight when determining fair value.[74]

---

[70] *Id.* at *42-43.

[71] *Id.* at *44.

[72] *See id.*

[73] *Id.*

[74] *Id.* at *51.

26

But, given that the trial court deemed it "illogical" to believe that another bidder would not have topped the Buyout Group's offer if the Company were actually worth the $28.61 per share advocated by the petitioners,[75] the Court of Chancery rejected petitioners' DCF and arrived at its "fair value" determination of $17.62 per share through its own DCF analysis, using a mix of the inputs proposed by the petitioners' and the Company's experts and adjustments of its own.

## F.    *This Appeal*

The Company argues that the trial court committed legal error and abused its discretion in failing to assign *any* weight to the deal price. On both fronts, the Company claims that the trial court erred by disregarding Section 262(h)'s requirement that it "take into account all relevant factors" in determining fair value.

The Company articulates three reasons why it believes the trial court committed legal error. First, the Company argues that there is no requirement under Delaware law that the deal price be the "most reliable" or "best" evidence of fair value in order for it to be given any weight. Second, the Company posits that there is no requirement under Delaware law that the Court of Chancery disregard the deal price entirely if it cannot unequivocally quantify the precise amount of sale process mispricing. Third, the Company contends that the trial court erred in fashioning what seems akin to a bright-line rule that the deal prices in MBO transactions are distorted and should be disregarded. Dell states

---

[75] *Id.* at *37.

27

that imposing such a rule would be "inconsistent with the flexible nature of the appraisal inquiry."[76]

Moreover, the Company notes that the trial court's conclusions underpinning its decision to disregard deal price do not follow from the facts as found. In particular, the Company maintains that the trial court lacked a basis for finding that: the market for Dell's stock was inefficient due to the alleged short-term focus of the Company's investor base, yielding a valuation gap between Dell's market value and its intrinsic value; the pre-signing phase lacked "meaningful price competition" because those involved in the sale process were fixated on determining a deal price that would generate the requisite IRR under the LBO model, and there were no strategic bidders involved; banks were reluctant to help finance the deal through debt, limiting the available leverage and therefore capping the deal price; the emergence of "topping bids" underscored the unfairness of the original merger consideration; and features endemic to MBO go-shops additionally distorted the relevance of the deal price. Thus, the Company argues that the trial court's entire reasoning for assigning no weight to the deal price was based either on flawed premises or on theoretical constructs that lack support in this factual record.

The Company also argues that, even if the trial court had a sound factual basis for disregarding the deal price entirely, its DCF analysis is flawed in three crucial ways: (1) it does not properly account for the Company's FIN 48 contingent liability reserve because it deducts only $650 million instead of the actual $3.01 billion in the Company's financial

---

[76] Appellant's Opening Br. at 26.

28

statements; (2) it fails to deduct taxes that would be due on foreign earnings if repatriated even though the trial court counted these earnings in calculating free cash flow; and (3) it employs the wrong tax rate in calculating the terminal value, the 21% effective tax rate instead of the marginal tax rate of 35.8%.

In response, the petitioners argue that the Court of Chancery *did* consider "all relevant factors"—including the deal price—in determining fair value as the Court of Chancery outlined a litany of reasons why the sale process distorted the deal price's worth as a proxy for fair value. Petitioners contend that the Company is itself the party advocating for an "inflexible bright-line rule" given that the Company seems to suggest that the Court of Chancery was required to "assign some mathematical weight to the deal price" in determining fair value.[77] The petitioners observe that this Court has previously rejected that formalism in light of the language of Section 262.

The petitioners also cross-appeal and argue that the trial court's DCF analysis is flawed in two respects: (1) it wrongly accepts the adjustments to management projections advocated by the Company; and (2) it improperly includes two deductions, namely a working capital deduction of $3 billion (despite Dell's history of funding its operations through free cash flow) and $1.2 billion in restricted cash.

## II.    *Analysis*

We agree with petitioners that the trial court *did consider* all relevant factors presented, including Dell's stock price and deal price. But we reverse because the

---

[77] Appellees/Cross-Appellants' Ans. Br. and Opening Br. on Cross-Appeal at 3, 44.

reasoning behind the trial court's decision to give no weight to any market-based measure of fair value runs counter to its own factual findings. After reviewing our appraisal statute and accompanying jurisprudence, we explore why the facts fail to support the Court of Chancery's reasoning for disregarding, in particular, the deal price. To the extent the trial court can justify giving any weight to its DCF analysis on remand, we conclude that, for the most part, the trial court did not abuse its discretion as to the asserted errors.

### A.      The Relevant Legal Framework

The General Assembly created the appraisal remedy in 1899 after amending the corporate code to allow a corporation to be sold upon the consent of a majority of stockholders instead of unanimous approval as was previously required.[78] Given that a single shareholder could no longer hold up the sale of a company, the General Assembly devised appraisal in service of the notion that "the stockholder is entitled to be paid for that which has been taken from him."[79] Stockholders who viewed the sale price as inadequate could seek "an independent judicial determination of the fair value of their shares" instead

---

[78] Hon. Sam Glasscock III, *Ruminations on Appraisal*, Del. Lawyer, Summer 2017, at 8; Charlotte K. Newell, *The Legislative Origins of Today's Appraisal Debate*, Del. Lawyer, Summer 2017, at 12-13.

[79] *Tri-Continental Corp. v. Battye*, 74 A.2d 71, 72 (Del. 1950). In *DFC*, we stated that the purpose of appraisal is to "make sure that [stockholders] receive fair compensation for their shares in the sense that it reflects what they deserve to receive based on what would fairly be given to them in an arm's-length transaction." 2017 WL 3261190, at *18.

30

of accepting the per-share merger consideration.[80]  There is one issue in an appraisal trial: "the value of the dissenting stockholder's stock."[81]

Appraisals are odd.  Unlike other cases, where one side loses if the other side fails to persuade the court that the evidence tilts its way,[82] appraisals require the court to determine a number representing the fair value of the shares after considering the trial presentations and submissions of parties who have starkly different objectives: petitioners contend fair value far exceeds the deal price, and the company argues that fair value is the deal price or lower.  In reality, the burden "falls on the [trial] judge to determine fair value, using 'all relevant factors.'"[83]

---

[80] *Alabama By-Prod. Corp. v. Cede & Co.*, 657 A.2d 254, 258 (Del. 1995); *Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182, 1186 (Del. 1988) ("An appraisal proceeding is a limited legislative remedy intended to provide shareholders dissenting from a merger on grounds of inadequacy of the offering price with a judicial determination of the intrinsic worth (fair value) of their shareholdings.").

[81] *Technicolor*, 542 A.2d at 1186 (quoting *Kaye v. Pantone, Inc.*, 395 A.2d 369, 374-75 (Del. Ch. 1978)).

[82] *M.G. Bancorp.*, 737 A.2d at 520 ("In a statutory appraisal proceeding, both sides have the burden of proving their respective valuation positions by a preponderance of the evidence.").

[83] *In re Appraisal of Ancestry.com*, 2015 WL 399726, at *1 (Del. Ch. Jan. 30, 2015) (quoting 8 *Del. C.* § 262(h)); Eric L. Talley, *Finance in the Courtroom: Appraising Its Growing Pains*, Del. Lawyer, Summer 2017, at 16-17 ("[U]nlike highly trained (and highly remunerated) investment bankers — whose job requires generating a 'football field' *range* of discounted cash flow (DCF) valuations — a judge presiding over an appraisal proceeding must conjure up a *single number* at the end of the process.").

31

Though the appraisal remedy is "entirely a creature of statute,"[84] like most statutes, its specifics have been refined through years of judicial interpretation. Indeed, "fair value" has become a "jurisprudential, rather than purely economic, construct."[85]

Importantly for our purposes here, Section 262 provides that the Court of Chancery "shall determine the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation" plus interest.[86] Equally critical is its requirement that, "[i]n determining such fair value, the Court shall take into account all relevant factors."[87] These provisions explain "what" the Court is valuing, and "how" the court should go about this task.

### i.    "What" the Court is Valuing

We have explained that the court's ultimate goal in an appraisal proceeding is to determine the "fair or intrinsic value" of each share on the closing date of the merger.[88] To reach this per-share valuation, the court should first envisage the entire pre-merger company as a "going concern," as a standalone entity, and assess its value as such.[89] "[T]he corporation must be viewed as an on-going enterprise, occupying a particular market

---

[84] *Alabama By-Prod. v. Cede*, 657 A.2d at 258 (quoting *Alabama By-Prod. Corp. v. Neal*, 588 A.2d 255, 256 (Del. 1991)).

[85] *DFC*, 2017 WL 3261190, at *16 (citing *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1144 (Del. 1989)).

[86] 8 *Del. C.* § 262(h).

[87] *Id.*

[88] *Cavalier Oil*, 564 A.2d at 1142-43.

[89] *Id.* at 1144 ("The dissenting shareholder's proportionate interest is determined only after the company as an entity has been valued.").

position in the light of future prospects."[90]  The valuation should reflect the "'operative reality' of the company as of the time of the merger."[91]

Because the court strives "to value the *corporation* itself, as distinguished from a specific fraction of its *shares* as they may exist in the hands of a particular shareholder," the court should not apply a minority discount when there is a controlling stockholder.[92] Further, the court should exclude "any synergies or other value expected from the merger giving rise to the appraisal proceeding itself."[93]

Then, once this total standalone value is determined, the court awards each petitioning stockholder his pro rata portion of this total—"his proportionate interest in [the] going concern"[94] plus interest.

---

[90] *Shell Oil*, 607 A.2d at 1218.

[91] *M.G. Bancorp.*, 737 A.2d at 525.

[92] *Cavalier Oil*, 564 A.2d at 1144 (internal quotation marks omitted).

[93] *Global GT LP v. Golden Telecom, Inc.*, 993 A.2d 497, 507 (Del. Ch. 2010), *aff'd*, 11 A.3d 214 (Del. 2010); *DFC*, 2017 WL 3261190, at *16 (The Court should exclude "any value that the selling company's shareholders would receive because a buyer intends to operate the subject company, not as a stand-alone going concern, but as a part of a larger enterprise, from which synergistic gains can be extracted." (quoting *Union Ill. 1995 Inv. LP v. Union Fin. Grp., Ltd*, 847 A.2d 340, 356 (Del. Ch. 2004))).  As noted in *DFC*, there are policy reasons for excising the synergistic value: "the specific buyer [should] not end up losing its upside for [the] purchase by having to pay out the expected gains from its own business plans for the company it bought to the petitioners." 2017 WL 3261190, at *16.  Further, "the broader excision of synergy gains could have also been thought of as a balance to the Court's decision to afford pro rata value to minority stockholders." *Id.*

[94] *Cavalier Oil*, 564 A.2d at 1144 (quoting *Tri-Continental*, 74 A.2d at 72).

By instructing the court to "take into account all relevant factors" in determining fair value, the statute requires the Court of Chancery to give fair consideration to "proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court."[95]  Given that "[e]very company is different; every merger is different,"[96] the appraisal endeavor is "by design, a flexible process."[97]

This Court has relied on the statutory requirement that the Court of Chancery consider "all relevant factors" to reject requests for the adoption of a presumption that the deal price reflects fair value if certain preconditions are met, such as when the merger is the product of arm's-length negotiation and a robust, non-conflicted market check, and where bidders had full information and few, if any, barriers to bid for the deal.[98]  In *Golden Telecom*, we explained that Section 262(h) is "unambiguous[]" in its command that the Court of Chancery undertake an "*independent*" assessment of fair value, and that the statute "vests the Chancellor and Vice Chancellors with significant discretion to consider 'all

---

[95] *Weinberger v. UOP*, 457 A.2d 701, 713 (Del. 1983).

[96] *In re Petsmart*, 2017 WL 2303599, at *26 (Del. Ch. May 26, 2017).

[97] *Golden Telecom, Inc. v. Global GT LP*, 11 A.3d 214, 218 (Del. 2010).

[98] *See DFC*, 2017 WL 3261190, at *1 ("We decline to engage in that act of creation, which in our view has no basis in the statutory text, which gives the Court of Chancery in the first instance the discretion to 'determine the fair value of the shares' by taking into account 'all relevant factors.'" (quoting 8 *Del. C.* § 262(h)).

relevant factors' and determine the going concern value of the underlying company."[99]  In *DFC*, we again rejected an invitation to create a presumption in favor of the deal price.[100] Even aside from the statutory command to consider all relevant factors, we doubted our ability to craft the precise preconditions for invoking such a presumption.[101]

As such, "the trial of an appraisal case under the Delaware General Corporation Law presents unique challenges to the judicial factfinder."[102]  And this task is complicated by "the clash of contrary, and often antagonistic, expert opinions of value," prompting the trial court to wade through "widely divergent views reflecting partisan positions" in arriving at its determination of a single number for fair value.[103]

In the end, after this analysis of the relevant factors, "[i]n some cases, it may be that a single valuation metric is the most reliable evidence of fair value and that giving weight to another factor will do nothing but distort that best estimate.  In other cases, it may be necessary to consider two or more factors."[104]  Or, in still others, the court might apportion

---

[99] 11 A.3d at 217-18.

[100] *DFC*, 2017 WL 3261190, at *15.

[101] *Id.* ("[N]ot only do we see no license in the statute for creating a presumption that the resulting price in such a situation is the 'exclusive,' 'best,' or 'primary' evidence of fair value, we do not share DFC's confidence in our ability to craft, on a general basis, the precise pre-conditions that would be necessary to invoke a presumption of that kind.").

[102] *Petsmart*, 2017 WL 2303599, at *1 (citing *Ancestry.com*, 2015 WL 399726, at *2).

[103] *Shell Oil*, 607 A.2d at 1222.

[104] *DFC*, 2017 WL 3261190, at *31; *see also M.G. Bancorp.*, 737 A.2d at 525-26 ("[T]he Court of Chancery has the discretion to select one of the parties' valuation models as its general framework or to fashion its own."); *id.* at 526 ("[A]lthough not required to do so, it is entirely proper for the Court of Chancery to adopt any one expert's model, methodology, and mathematical calculations, *in toto*, if that valuation is supported by credible evidence and withstands a critical judicial analysis on the record.").

weight among a variety of methodologies.  But, whatever route it chooses, the trial court

must justify its methodology (or methodologies) according to the facts of the case and

relevant, accepted financial principles.[105]

Given the human element in the appraisal inquiry—where the factfinder is asked to

choose between two competing, seemingly plausible valuation perspectives, forge its own,

or apportion weight among a variety of methodologies—it is possible that a factfinder,

even the same factfinder, could reach different valuation conclusions on the same set of

facts if presented differently at trial.[106]  There may be no perfect methodology for arriving

at fair value for a given set of facts, and the Court of Chancery's conclusions will be upheld

---

[105] The statute does not instruct the Court of Chancery to create an investment bank-like football field and use it to come to a formulaic determination of value.  In many situations, certain valuation methods (e.g., comparables-based analysis) may be of no reliable utility.  Our cases stress that the statute assigns the Court of Chancery the duty to consider the relevant methods of valuation argued by the parties and then determine which method (and inputs), or combination of methods, yields the most reliable determination of value.  *See also DFC*, 2017 WL 3261190, at *3 ("[I]f the Court of Chancery chooses to use a weighting of different valuation methodologies to reach its fair value determination, the court must explain its weighting in a manner supported by the record before it."); *id.* at *31 ("[T]he Court of Chancery must exercise its considerable discretion while also explaining, with reference to the economic facts before it and corporate finance principles, why it is according a certain weight to a certain indicator of value.").

[106] *M.G. Bancorp.*, 737 A.2d at 526 ("The Court of Chancery's role as an independent appraiser does not necessitate a judicial determination that is completely separate and apart from the valuations performed by the parties' expert witnesses who testify at trial. It must, however, carefully consider whether the evidence supports the valuation conclusions advanced by the parties' respective experts."); *see also Petsmart*, 2017 WL 2303599, at *27 n.338 ("My analysis of the reliability of deal price as a product of the efficacy of the sales process necessarily has been shaped by the arguments of counsel and the evidence they chose to present at trial."); *Merion Capital L.P. v. Lender Processing Servs.*, 2016 WL 7324170, at *16 (Del. Ch. Dec. 16, 2016) ("An argument may carry the day in a particular case if counsel advance it skillfully and present persuasive evidence to support it.  The same argument may not prevail in another case if the proponents fail to generate a similarly persuasive level of probative evidence or if the opponents respond effectively.").

if they follow logically from those facts and are grounded in relevant, accepted financial principles.[107]  "To be sure, "fair value" does not equal "best value.""[108]

### B.    The Court of Chancery's Reasons for Disregarding Deal Price Do Not Follow from the Record

The Company recasts the Court of Chancery's fair value opinion as creating several bright-line rules, including that the court must assign no weight to the deal price if: (i) it is not the "best" evidence of fair value; (ii) the court cannot "quantify the exact degree of the sale process mispricing"; or (iii) the transaction is an MBO.  And the Company argues that each such rule is flawed.  Setting aside whether the Court of Chancery's opinion actually purports to assert these more generalized propositions, we agree with the Company's core premise that, on this particular record, the trial court erred in not assigning any mathematical weight to the deal price.  In fact, the record as distilled by the trial court suggests that the deal price deserved heavy, if not dispositive, weight.

---

[107] *DFC*, 2017 WL 3261190, at *1 ("[T]his Court must give deference to the Court of Chancery if its determination of fair value has a reasonable basis in the record and in accepted financial principles relevant to determining the value of corporations and their stock."); *id.* at *20 ("Although the Court of Chancery has broad discretion to make findings of fact, those findings of fact have to be grounded in the record and reliable principles of corporate finance and economics.").

[108] *See id.* at *18.  Rather, as framed in another context, a fair price "means a price that is one that a reasonable seller, under all of the circumstances, would regard as within a range of fair value; one that such a seller could reasonably accept." *Id.* (quoting *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1143 (Del. Ch. 1994), *aff'd*, 663 A.2d 1156 (Del. 1995)).  And "[t]he fact that a transaction price was forged in the crucible of objective market reality (as distinguished from the unavoidably subjective thought process of a valuation expert) is viewed as strong evidence that the price is fair." *Van de Walle v. Unimation, Inc.*, 1991 WL 29303, at *17 (Del. Ch. Mar. 7, 1991).  *See also Applebaum v. Avaya, Inc.*, 812 A.2d 880, 889-90 (Del. 2002) (stating that "in many circumstances a property interest is best valued by the amount a buyer will pay for it" and "a well-informed, liquid trading market will provide a measure of fair value superior to any estimate the court could impose.").

On the other hand, we also agree with the petitioners that there is no requirement that the court assign some mathematical weight to the deal price, and that the court fulfilled its statutory obligation to take into account the deal price. The trial court's thorough examination of Dell's stock market dynamics and sale process demonstrates its consideration of these factors. But we reverse because there is a dissonance between the key underpinnings of the decision to disregard the deal price and the facts as found, and this dissonance distorted the trial court's analysis of fair value.

The three central premises that the Court of Chancery relied upon to assign no weight to the deal price were flawed. First, the court believed that a "valuation gap" existed between Dell's stock price and the Company's intrinsic value, and this conclusion—contrary to the efficient market hypothesis—led it to hypothesize that the bidding over Dell as a company was anchored at an artificially low price that depressed the ultimate deal price below fair value. Second, the court suggested that the lack of strategic buyers in the sale process—and, accordingly, the involvement of only private equity bidders—also pushed the deal price below fair value. Third, the court concluded that several factors endemic to MBO go-shops further undercut the deal price's credibility. We consider each of these premises in turn and find them untenable in view of the Court of Chancery's own findings of fact as considered in light of established principles of corporate finance. Without these premises, the trial court's support for disregarding the deal price collapses.

Accordingly, the trial court's reliance on them as a basis for granting no weight to the market-based indicators of value constituted an abuse of discretion meriting reversal.[109]

> i. **The Trial Court Lacked a Valid Basis for Finding a "Valuation Gap" Between Dell's Market and Fundamental Values**

The Court of Chancery presumed "investor myopia" and hangover from the Company's "nearly $14 billion investment in its transformation, which had not yet begun to generate the anticipated results" produced a "valuation gap" between Dell's fundamental and market prices. That presumption contributed to the trial court's decision to assign no weight to Dell's stock price or deal price.[110] The trial court believed that short-sighted analysts and traders impounded an inadequate—and lowball—assessment of all publicly available information into Dell's stock price, diminishing its worth as a valuation tool.[111] But the record shows just the opposite: analysts scrutinized Dell's long-range outlook when evaluating the Company and setting price targets, and the market was capable of accounting for Dell's recent mergers and acquisitions and their prospects in its valuation of the Company.[112]

---

[109] *See Rapid-Am. Corp. v. Harris*, 603 A.2d 796, 802 (Del. 1992) ("A court abuses its discretion in an appraisal proceeding when its factual findings do not have record support and its valuation is not the result of an orderly and logical deductive process.").

[110] *Dell Trial Fair Value*, 2016 WL 3186538, at *32, *34.

[111] *Id.* at *33.

[112] *See, e.g.*, Jefferies (May 11, 2012), at A3282 ("With half of Dell's sales still exposed to the PC market, the continuing degradation remains a worry. Recent software acquisitions provide tailwinds but in terms of size are unlikely as a whole to be big enough to completely move the needle."); Barclays (May 14, 2012), at A3426 ("We believe the biggest issues facing the stock include secular challenges in PCs, inconsistent margins & acquisition risk."); Goldman Sachs (Sept. 27, 2012), at A3427 ("We believe that PC OEMs such as Hewlett-Packard and Dell, will

Further, the Court of Chancery's analysis ignored the efficient market hypothesis long endorsed by this Court. It teaches that the price produced by an efficient market is generally a more reliable assessment of fair value than the view of a single analyst, especially an expert witness who caters her valuation to the litigation imperatives of a well-heeled client.[113]

A market is more likely efficient, or semi-strong efficient, if it has many stockholders; no controlling stockholder; "highly active trading"; and if information about the company is widely available and easily disseminated to the market.[114] In such circumstances, a company's stock price "reflects the judgments of many stockholders about the company's future prospects, based on public filings, industry information, and research conducted by equity analysts."[115] In these circumstances, a mass of investors

---

remain under significant pressure, as weak unit growth, aggressive PC pricing, and relatively firm component prices (particularly HDDs) combine to pressure both revenues and margins."); Cowen (Nov. 16, 2012), at A3427 ("Dell's PC issues are unlikely to be solved by the Windows 8 launch as the market's structure has fundamentally shifted away from the paradigm that dominated the last two decades."); Goldman Sachs (Dec. 2, 2012), at A3832 ("Dell still likely has billions more in acquisitions ahead of it if it plans on fully executing on its mission to become an enterprise solutions company.").

[113] *See DFC*, 2017 WL 3261190, at *18 (also noting that "the relationship between market valuation and fundamental valuation has been strong historically"); *id*. at *21 (describing the price produced by an efficient market as "informative of fair value"); *id.* at *21 n.144 ("In an efficient market you can trust prices, for they impound all available information about the value of each security." (quoting Richard A. Brealey et. al., *Principles of Corporate Finance* 214 (2008))). And, even if the market were not precisely efficient, petitioners' own expert has conceded that "[a] market that is not perfectly efficient may still value securities more accurately than appraisers who are forced to work with limited information and whose judgments by nature reflect their own views and biases." Bradford Cornell, *Corporate Valuation* 46 (1993).

[114] *DFC*, 2017 WL 3261190, at *21.

[115] *Id.*

quickly digests all publicly available information about a company, and in trading the company's stock, recalibrates its price to reflect the market's adjusted, consensus valuation of the company.[116]

The record before us provides no rational, factual basis for such a "valuation gap." Indeed, the trial court did not indicate that Dell lacked a vast and diffuse base of public stockholders, that information about the Company was sparse or restricted, that there was not an active trading market for Dell's shares, or that Dell had a controlling stockholder— or that the market for its stock lacked any of the hallmarks of an efficient market. In fact, the record shows that Dell had a deep public float,[117] was covered by over thirty equity analysts in 2012,[118] boasted 145 market makers,[119] was actively traded with over 5% of shares changing hands each week,[120] and lacked a controlling stockholder.[121] As noted in the expert reports, Dell's stock price had a track record of reacting to developments

---

[116] *Id.* at *18 ("[C]orporate finance theory reflects a belief that if an asset—such as the value of a company as reflected in the trading value of its stock—can be subject to close examination and bidding by many humans with an incentive to estimate its future cash flows value, the resulting collective judgment as to value is likely to be highly informative and that, all estimators having equal access to information, the likelihood of outguessing the market over time and building a portfolio of stocks beating it is slight.").

[117] Dell's Valuation Expert Report, *supra* note 4, at A3423 (public float averaging 84.29% in 2012).

[118] *Id.* at A3424.

[119] *Id.*

[120] *Id.* at A3423.

[121] M. Dell Testimony, *supra* note 18, at A610; Transcript of Guhan Subramanian Trial Testimony (Oct. 7, 2015), at A998.

concerning the Company. For example, the stock climbed 13% on the day the Bloomberg first reported on Dell's talks of going private.[122]

Further, the trial court expressly found no evidence that information failed to flow freely or that management purposefully tempered investors' expectations for the Company so that it could eventually take over the Company at a fire-sale price, as in situations where long-term investments actually led to such valuation gaps.[123] In fact, Mr. Dell tried to persuade investors to envision an enterprise solutions and services business enjoying double-digit sales growth and which would more than compensate for any decline in end-user computing.[124] And he pitched this plan for a "prolonged" period, approaching nearly three years.[125]

---

[122] Dell's Valuation Expert Report, *supra* note 4, at A3305-06.

[123] *Dell Trial Fair Value*, 2016 WL 3186538, at *24; *id.* at *34 ("Only when the gap persisted despite their efforts, and after both Southeastern and Silver Lake suggested the possibility of an MBO to Mr. Dell, did he eventually decide to pursue the opportunity that the market price was presenting.").

[124] *Id.* at *2 ("Mr. Dell conferred with his management team and hired consultants to devise strategies to help the market view the Company as 'a sum of the parts.' Mr. Dell regularly communicated his views to analysts.").

[125] *See id.* at *34 ("Mr. Dell identified the opportunity to take the Company private after the stock market failed to reflect the Company's going concern value over a prolonged period [of almost three years, beginning] . . . as early as January 2011."); *id.* at *15 ("Mr. Dell[] . . . was focused on a long-term strategy of stabilizing revenues and capturing market share at the expense of short-term margins, just as he repeatedly had told the Board, the Committee, and stock market analysts.").

There is also no evidence in the record that investors were "myopic" or shortsighted. Rather, the record shows analysts understood Dell's long-term plans.[126]  But they just weren't buying Mr. Dell's story:

- "Though Dell may have an advantage in the near term with its new next-gen 12G servers, we believe over the longer run, incremental shares gain in the x86 market will likely be limited.  As such, we expect Dell's server business to grow roughly in line with the market." (Wells Fargo, June 27, 2012, at A3429)

- "Top-tier OEMs continued to lose market share to white-box vendors, shedding 85 basis points of revenue share at 111 points of unit share [year-over-year].  As we have mentioned before, in the longer term we expect that this dynamic will continue, further pressuring x86 units and revenues for top-tier OEMs, while adding further forces of commoditization across the x86 server market." (Goldman Sachs, Sept. 10, 2012, at A3429)

- "While the company remains optimistic that recent enhancements to its storage portfolio could rekindle growth when demand improves, Dell's slowing momentum here remains a factor to watch." (Goldman Sachs, Nov. 16, 2012, at A3430)

- "We see risks for Dell including cyclical global PC and enterprise IT markets, including slowing in mature geographies, combined with competitive pricing and margin pressures from both large systems peers and aggressive commodity suppliers.  PC unit and margin risks also include underlying dynamics in volume component supply." (Evercore, Nov. 16, 2012, at A3430)

- "While we acknowledge Dell's enterprise strategy, we still have concerns around whether it can ramp fast enough to offset pressures in PC-related businesses, including PC support and related sales of peripherals." (Barclays, Dec. 3, 2012, at A3430)

---

[126] *Id.* at *2 ("Market observers expressed doubt about management's projections."); *id*. ("The Company's market price suggested that the marginal purchaser shared the analysts' skepticism.").

The Court of Chancery's myopia theory also overlooks that, at an earlier stage in its history, Dell was a growth stock trading at large multiples to its then-current cash flow.[127] That is, for much of its history, analysts bought Mr. Dell's long-term vision. But, by the early years of the second decade of the 21st century, they were no longer doing so.[128]

Further, the prospective bidders who later reviewed Dell's confidential information all dropped out due to their considerable discomfort with the future of the PC market. The record simply does not support the Court of Chancery's favoring of management's optimism over the public analysts' and investors' skepticism—especially in the face of management's track record of missing its own projections.[129] (Even Mr. Dell doubted his management team's forecasting abilities and conceded at trial, "We're not very good at forecasting.")[130] And the Court of Chancery does not justify why it chose to do so. In

---

[127] In 1999, Dell's "earnings multiple"—its enterprise value (the market value of the company's equity plus the company's debt minus its cash) divided by its Earnings Before Interest Taxes Depreciation and Amortization (or "EBITDA")—was almost sixty. In contrast, by 2013, Dell's EV/EBITDA ratio hovered between four and five. *See* Dell's Valuation Expert Report, *supra* note 4, at A3295-96, A3300.

[128] *See id.* at A3300 (showing that Dell's EV/EBITDA ratio remained around or above twenty between 1998 and 2005 and that the ratio has remained under ten since 2009).

[129] *See id.* at *2, *6, *8. Management's history of missing its forecasts should have given the Court of Chancery pause. *See, e.g.*, *In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at *42 (Del. Ch. Sept. 4, 2014) ("The Court cannot accept that the same people who missed projections three-months out in September 2001 by a factor of three (where there was no intervening change to the Company's business) would have been able to produce reliable projections in January 2002 for an entire year."), *aff'd sub nom. Fuchs v. Wren Holdings, LLC*, 129 A.3d 882 (Del. 2015); Edward P. Welch et al., *Folk on the Delaware General Corporation Law* § 262.10, at 9-232 (6th ed. 2017) [hereinafter *Folk*] ("[T]he court will not use management projections in its valuations if the record shows they are unreliable.").

[130] M. Dell Testimony, *supra* note 18, at A605. Mr. Dell added:

> I think we weren't the only ones that were bad at forecasting. I think Gartner Group and IDC, and many of the financial analysts and our competitors, you know, all had

short, the record does not adequately support the Court of Chancery's conclusion that the market for Dell's stock was inefficient and that a valuation gap in the Company's market trading price existed in advance of the lengthy market check, an error that contributed to the trial court's decision to disregard the deal price.[131]

> ii.   *The Lack of Strategic Bidders Is Not a Credible Reason for Disregarding the Deal Price*

The trial court's complete discounting of the deal price due to financial sponsors' focus on obtaining a desirable IRR and not "fair value" was also error. Although the trial court did not have the benefit of our opinion in *DFC*, we rejected this view there and do so again here given we see "no rational connection" between a buyer's status as a financial sponsor and the question of whether the deal price is a fair price.[132] After all, "all disciplined buyers, both strategic and financial, have internal rates of return that they expect

---

> a pretty difficult time forecasting what was an uncertain and volatile business, with many, you know, changing factors, new products being introduced, all sorts of competitive forces that were hard to predict. And we were not very good at doing it.

*Id.* at A605-06.

[131] This is evident as the court observed that the stock price anchors negotiations and, if the stock price is low, the deal price necessarily might be low. *See Dell Trial Fair Value*, 2016 WL 3186538, at *33 ("When a company with a depressed market price starts a sale process, the anchoring effect makes the process intuitively more likely to generate an undervalued bid.").

[132] *DFC*, 2017 WL 3261190, at *22; *id.* at *2 ("To be candid, we do not understand the logic of [diminishing the weight of a sale process that involved only financial sponsors and not strategic buyers]. Any rational purchaser of a business should have a targeted rate of return that justifies the substantial risks and costs of buying a business. That is true for both strategic and financial buyers. It is, of course, natural for all buyers to consider how likely a company's cash flows are to deliver sufficient value to pay back the company's creditors and provide a return on equity that justifies the high costs and risks of an acquisition.").

in exchange for taking on the large risk of a merger, or for that matter, any sizeable investment of its capital."[133]

We found in *DFC* that the notion of a "private equity carve out" stood on especially shaky footing where other objective indicia suggested the deal price was a fair price.[134] Such objective factors in *DFC* included that "every logical buyer" was canvassed, and all but the buyer refused to pursue the company when given the opportunity; concerns about the company's long-term viability (and its long-term debt's placement on negative credit watch) prevented lenders from extending debt; and the company repeatedly underperformed its projections.[135]

Here, it is clear that Dell's sale process bore many of the same objective indicia of reliability that we found persuasive enough to diminish the resonance of any private equity carve out or similar such theory in *DFC*. For example, JPMorgan and Evercore choreographed the sale process to involve competition with Silver Lake at every stage, both pre-signing and during the go-shop. When KKR walked, TPG, another major-league PE buyer, was introduced. And both KKR and TPG demurred for many of the objective reasons that the stock market—and, later, Blackstone—doubted Dell's ability to transform itself and become more profitable.

---

[133] *Id.* at *22; *see also id.* at *2 ("The 'private equity carve out' that the Court of Chancery seemed to recognize, in which the deal price resulting in a transaction won by a private equity buyer is not a reliable indication of fair value, is not one grounded in economic literature or this record.").

[134] *Id.* at *22.

[135] *Id.* at *22-23.

Moreover, JPMorgan did not initially solicit the interest of strategic bidders because its analysis suggested none was likely to make an offer.[136]  Further, given leaks that Dell was exploring strategic alternatives, record testimony suggests that Evercore presumed that any interested parties would have approached the Company before the go-shop if serious about pursuing a deal.[137]

The Committee, composed of independent, experienced directors and armed with the power to say "no," persuaded Silver Lake to raise its bid six times.  Nothing in the record suggests that increased competition would have produced a better result.  JPMorgan also reasoned that any other financial sponsor would have bid in the same ballpark as Silver Lake.[138]

The bankers canvassed the interest of sixty-seven parties, including twenty possible strategic acquirers during the go-shop.  The go-shop's forty-five-day window afforded potential bidders enough time to decide whether to continue to explore a transaction by submitting a non-binding indication of interest that qualified as a "Superior Proposal," which accordingly would lower the termination fee from $450 million to $180 million thanks to "Excluded Party" status and give that party months to scrutinize the Company's finances and growth prospects.  The trial court acknowledged, "the steps to become an

---

[136] Transcript of Ronald Nicol Trial Testimony (Oct. 6, 2015), at A705; Transcript of Drago Rajkovic Trial Testimony (Oct. 7, 2015), at A907.

[137] Hiltz Testimony, *supra* note 37, at A516.

[138] *Dell Trial Fair Value*, 2016 WL 3186538, at *9.

47

'Excluded Party' were also relatively few."[139] And the court even endorsed the go-shop's overall design as "rais[ing] fewer structural barriers than the norm" and both "relatively open" and "relatively flexible."[140] Further, Evercore's compensation was "tied directly to the success of the go-shop," incentivizing it to make the go-shop as effective as possible.[141]

The likeliest strategic bidder, HP, signed a confidentiality agreement during the go-shop, but it did not even log into the data room. Three parties signed non-binding initial expressions of interest: Blackstone, Icahn, and GE Capital.[142] Yet, despite the quality of the go-shop's design, the Court of Chancery believed that, given Dell's complexity as a company, "the magnitude of the task" of conducting diligence on it might have had "a chilling effect on other parties," without citing any evidence that any other party would have been interested.[143] Regardless, interested parties did not need to complete diligence within the go-shop's forty-five-day window.

The Court of Chancery stressed its view that the lack of competition from a strategic buyer lowered the relevance of the deal price. But its assessment that more bidders—both strategic and financial—should have been involved assumes there was some party interested in proceeding. Nothing in the record indicates that was the case. Fair value

---

[139] *Id.* at *40.

[140] *Id.* at *40-41.

[141] Hiltz Testimony, *supra* note 37, at A514; Rebuttal Report of Professor Guhan Subramanian (July 24, 2015), at B1902, B1903-05 [hereinafter Petitioners' Deal Process Expert Report].

[142] *Dell Trial Fair Value*, 2016 WL 3186538, at *42.

[143] *Id.*

entails at minimum a price some buyer is willing to pay—not a price at which no class of buyers in the market would pay.[144] The Court of Chancery ignored an important reality: if a company is one that no strategic buyer is interested in buying, it does not suggest a higher value, but a lower one. "[O]ne should have little confidence she can be the special one able to outwit the larger universe of equally avid capitalists with an incentive to reap rewards by buying the asset if it is too cheaply priced."[145]

The magnitude of a potential Dell deal narrowed the class of prospective buyers even further—to the largest PE firms such as KKR, TPG, and Blackstone—though the trial court did not cite persuasive evidence in the record that this diminished the relevance of the deal price. In fact, Blackstone proved a formidable check on the fair value of the Silver Lake deal given Blackstone's expenditure of resources on the project and ostensible willingness to do a deal if worthwhile. After submitting an initial proposal and gaining Excluded Party status during the go-shop, Blackstone spent nearly a month evaluating the Company, involving over 460 of its employees in diligence via the virtual data room and in a ballroom in Texas for in-person diligence with Dell employees. Dell agreed to reimburse it for these costs, as it did for Icahn, but Blackstone nonetheless still incurred the opportunity cost of channeling time and resources away from other deals, underscoring Blackstone's commitment.

---

[144] *See DFC*, 2017 WL 3261190, at *22 n.154 ("[T]he absence of synergistic buyers for a company is itself relevant to its value.").

[145] *Id.* at *15.

And this was not a buyout led by a controlling stockholder. Michael Dell only had approximately 15% of the equity.[146] He pledged his voting power would go to any higher bidder, voting in proportion to other shares.

Other than the Buyout Group, as mentioned, all prospective buyers who reviewed the Company's confidential information retreated for the same reasons that the public markets were purportedly undervaluing Dell—trepidation about the future of the PC industry and the prospects of Dell's long-term turnaround strategy. This consistency confirms that management did not intentionally depress the Company's stock price in order to take advantage of a "trough" that public investors failed to recognize.[147] In fact, the trial court expressly found that, "unlike other situations that this court has confronted, there is no evidence that Mr. Dell or his management team sought to create the valuation disconnect so that they could take advantage of it," and "[t]o the contrary, they tried to convince the market that the Company was worth more."[148] Prospective buyers just did not believe the potential for a turnaround outweighed the risk of further erosion of PC sales and, accordingly, the Company's balance sheet. This coherence in views also makes it hard to

---

[146] M. Dell Testimony, *supra* note 18, at A610.

[147] *Cf. Glassman v. Unocal Expl. Corp.*, 777 A.2d 242, 248 (Del. 2001) ("[I]f the merger was timed to take advantage of a depressed market, or a low point in the company's cyclical earnings, or to precede an anticipated positive development, the appraised value may be adjusted to account for those factors.").

[148] *Dell Trial Fair Value*, 2016 WL 3186538, at *34.

50

take seriously the notion that Dell investors were incapable of accounting for Dell's long-term strategy. And it reinforces the integrity of both Dell's stock price and deal price.[149]

Overall, the weight of evidence shows that Dell's deal price has heavy, if not overriding, probative value. The transaction process exemplifies many of the qualities that Delaware courts have found favor affording substantial, if not exclusive, weight to deal price in the fair value analysis. Even the Court of Chancery's own summary remarks suggest the deal price deserves weight as the court characterized the sale process as one that "easily would sail through if reviewed under enhanced scrutiny" and observed that "[t]he Committee and its advisors did many praiseworthy things," too numerous to catalog in its opinion, as the trial court noted.[150] Given the objective indicia of the deal price's reliability and our rejection of the notion of a private equity carve out, to the extent that the Court of Chancery chose to disregard Dell's deal price based on the presence of only private equity bidders, its reasoning is not grounded in accepted financial principles, and this assessment weighs in favor of finding an overall abuse of discretion. As explained below, there are other reasons that lead us to this conclusion.

---

[149] *See DFC*, 2017 WL 3261190, at *20 (rejecting the argument that the market was incapable of accounting for regulatory risk and positing instead that such risk was, in fact, baked into the equity market price); *id.* at *21 ("That these other potential buyers dropped out of the sales process after receiving confidential information about DFC suggests that these parties were aware of the 'trough' DFC was in at the time and the uncertain future regulatory risk it faced, and ultimately did not think a transaction with DFC was worth pursuing. Indeed, [one of the two possible buyers who submitted a non-binding indication of interest] cited the regulatory risk facing the company as its reason for not wanting to pursue a transaction with DFC.").

[150] *Dell Trial Fair Value*, 2016 WL 3186538, at *29.

*iii.* *Features of MBOs Which Could Theoretically Undermine
the Probative Value of the Deal Price Are Not Present Here.*

The Court of Chancery focused on three problems supposedly present in all MBOs to show that the deal price here is not evidence of fair value: (a) structural issues; (b) the "winner's curse"; and (c) management's perceptive value to the company. Yet none of these theoretical characteristics detracts from the reliability of the deal price on the facts presented here. As a result, the trial court's reliance on these themes to disregard the deal price in its fair value analysis was error.

*a.* *The record does not show that structural issues
inhibited the effectiveness of the go-shop*

Though it is true that "[t]he structure of the go-shop is an obvious factor that affects a participant's pathway to success," even the petitioners' expert characterized the structure here as "rais[ing] fewer structural barriers than the norm"[151] and found no disqualifying fault with the design of Dell's go-shop. The trial court determined "[t]he main structural problem that [petitioners' expert] identified did not result from the terms of the go-shop in the abstract, but rather stemmed from the size and complexity of the Company."[152] But the "size and complexity" of Dell is not a characteristic unique to MBO go-shops, but a feature inherent to Dell. And, if size and complexity of a company were enough to render the ultimate deal price undeserving of any weight in the fair value analysis, it would deprive the deal price of any deference whenever any large and complex company is appraised.

---

[151] *Id.* at *40.

[152] *Id.* at *42.

52

In any event, Blackstone was well-equipped to overcome the size and complexity of Dell to fashion a rival competitive bid during the go-shop, and it expended the resources to do so—helping to push the original merger consideration higher. In fact, three parties gained Excluded Party status, demonstrating that claims of a "chilling effect" lack force.[153]

Further, the Court of Chancery dismissed Dell's deal price because, when confronting a proposed MBO, possible bidders during go-shops purportedly rarely submit topping bids because they have no "realistic pathway to success."[154] Although that may be true in some MBOs, here, rival bidders such as Blackstone, TPG, HP, and Icahn did have a realistic pathway to succeeding if they desired. And two non-binding proposals for the whole company and one for part of it surfaced. Of the transactions that featured go-shops announced between January 2006 and June 2015, fourteen deals had go-shops that produced superior bids (excluding the Dell deal).[155] Two were MBOs:[156] one resulted in a 45% premium over the announced offer price,[157] and the other yielded a per-share price that was 22% higher than the originally announced price.[158] Petitioners' deal process expert attempted to distinguish those deals by explaining management was not crucial to

---

[153] *Cf. id.* ("[T]hat does not mean that the magnitude of the task did not have a chilling effect on other parties.").

[154] *Id.* at *39.

[155] Petitioners' Deal Process Expert Report, *supra* note 141, at B1884.

[156] *Id.*

[157] *Id.* at B1885.

[158] *Id.* at B1886.

53

either.[159] But, as noted below, there is no evidence that management was critical here given both Blackstone's and Icahn's doubts about Mr. Dell's leadership and apparent willingness to pursue transactions without his continued involvement.

> b. *The threat of a "winner's curse" does not provide a valid reason for disregarding the deal price based on this record.*

The "winner's curse" describes a theory that, in outbidding incumbent management to "win" a deal, a buyer likely overpays for the company because management would presumably have paid more if the company were really worth it. Recognizing this phenomenon, prospective bidders supposedly resist outbidding incumbent management for fear they might later discover the information that prevented management from bidding even higher in the first place. But the likelihood of a winner's curse can be mitigated through a due diligence process where buyers have access to all necessary information. And, here, Dell allowed Blackstone to undertake "extensive due diligence," diminishing the "information asymmetry" that might otherwise facilitate a winner's curse.

Mr. Dell "ultimately spent more time with Blackstone than any of the other participants, including Silver Lake," and the Court of Chancery found that "[t]he record provided no reason to harbor any concern about Mr. Dell's level of cooperation or responsiveness," and "all of the bidders received access to the data they requested."[160] The

---

[159] *See Dell Trial Fair Value*, 2016 WL 3186538, at *36 n.35; Petitioners' Deal Process Expert Report, *supra* note 141, at B1885-86.

[160] *Dell Trial Fair Value*, 2016 WL 3186538, at *42.

trial court even concluded that "the Committee appears to have addressed the problem of information asymmetry and the risk of the winner's curse as best they could."[161] Yet in spite of Dell's efforts, the court concluded, the threat of a winner's curse is nonetheless "endemic to MBO go-shops" and imposes a "powerful disincentive for any competing bidder," even though Blackstone and Icahn surfaced with non-binding proposals.[162] But, aside from the theoretical, the Court of Chancery did not point to any bidder who actually shied away from exploring an acquisition out of fear of the winner's curse phenomenon.

The Court of Chancery's analysis of the winner's curse phenomenon also suggests that "[s]trategic buyers are less subject to the winner's curse because they typically possess industry-specific expertise and have asset-specific valuations that incorporate synergies."[163] Therefore, the "winner's curse" theory cannot explain the lack of strategic buyers—one of the primary faults the court found with the sale process.

The Court of Chancery also posited that Mr. Dell's vast knowledge about the Company required that any rival bidder "have a strategy for dealing with Mr. Dell's superior knowledge."[164] Blackstone had such a strategy: its diligence team included David Johnson, who had recently left Dell as head of acquisitions and strategy.[165] Further, as discussed below, the record also suggests that Icahn doubted the value of Mr. Dell's insight.

---

[161] *Id.* at *43.

[162] *Id.*

[163] *Id.* at *42.

[164] *Id.*

[165] *See id.* at *13 ("Blackstone had a sophisticated technology group and one of its partners, David Johnson, had recently worked as the Company's head of acquisitions."); Mandl Testimony, *supra*

55

Thus, while the notion of a "winner's curse" might deter rival bids in some MBOs, the record in this case does not provide a basis for suspecting that it did so here—especially given the theory is rebutted directly in the record by two proposals from financial sponsors during the go-shop.[166] The more likely explanation for the lack of a higher bid is that the deal market was already robust and that a topping bid involved a serious risk of overpayment. If a deal price is at a level where the next upward move by a topping bidder has a material risk of being a self-destructive curse, that suggests the price is already at a level that is fair. The issue in an appraisal is not whether a negotiator has extracted the highest possible bid. Rather, the key inquiry is whether the dissenters got fair value and were not exploited.

### c. Management's Inherent Value to the Company

The Court of Chancery also presumed that "Mr. Dell's value to the Company" imposed another impediment to the likelihood of rival bidders succeeding and thus dissuaded them from even trying.[167] But, again, the Court of Chancery's own fact findings contradict and do not rationally support this conclusion.

---

note 34, at A333-34; Hiltz Testimony, *supra* note 37, at A521; Petitioners' Deal Process Expert Report, *supra* note 141, at B1893-94.

[166] The record also suggests that Mr. Dell believed private equity firms were just as capable of assessing Dell's prospects. After both KKR and TPG passed on continuing to pursue the Company during the pre-signing phase, Mr. Dell recalled, "I was disappointed. I was starting to think that maybe *we* were missing something." M. Dell Testimony, *supra* note 18, at A596 (emphasis added).

[167] *Dell Trial Fair Value*, 2016 WL 3186538, at *43.

First, the trial court supports its assessment that "the Company's relationship with Mr. Dell was an asset in itself" through event studies showing that Dell's stock dropped when he left in 2004 and jumped upon his return in 2007.[168] But it does not explain why it could trust the market's ability to assess the value of Mr. Dell's leadership but not its ability to serve as a reliable indicator of the value of Dell's stock. Further, assuming *arguendo* that market data from 2007 demonstrated Mr. Dell's value to the Company in 2007, it does not follow that such evidence showed his value six years later, in 2013, at the time of the Merger—after Dell's stock had languished for several years and investors questioned Mr. Dell's strategy for transforming the Company (another finding of the trial court). Stale event studies and a single, self-serving e-mail from Mr. Dell suggesting that a *potential* customer might not engage the Company if he were replaced do not amount to sufficient evidence of Mr. Dell's actual value.[169] The Court of Chancery's view of this issue is also in tension with its myopia theory. If Mr. Dell was as valued by market players and as trusted by the stock market as this aspect of the Court of Chancery's decision implies, then the decision's failure to give any weight to the stock market's reaction to Mr. Dell's lengthy efforts to convince it of the bright future that the transformation plan augured for Dell stockholders is difficult to understand.

---

[168] *Id.* at *44 (citing event studies showing the Company lost $1.2 billion in market value upon Mr. Dell's departure from the Company in March 2004 and gained $2.5 billion in market value upon his return in January 2007).

[169] *Id.* at *43 n.42.

The Court of Chancery also acknowledged "evidence that Blackstone and Icahn did not regard Mr. Dell as essential to their bids."[170] Blackstone had investigated possible replacements as CEO.[171] And Icahn advised stockholders that he believed "the company would be worth far, far more" without Mr. Dell at the helm.[172]

And, even if one could accept the trial court's view that Mr. Dell's service as CEO added per-share value to the Company's stock, the record does not suggest that he would have stopped serving the Company if Blackstone, TPG, or another reputable buyer had prevailed. He was contractually obligated to explore "any such potential counterparty or financing source if requested by the Committee," though he had "discretion" as to whether to continue after such exploration.[173] Significantly, based on Mr. Dell's good faith during the go-shop and "credibl[e]" testimony at trial, the Court of Chancery concluded that "the record indicated that Mr. Dell actually was willing to work with other buyout groups."[174]

Thus, it is difficult to discern how "Mr. Dell's unique value and his affiliation with the Buyout Group were negative factors that inhibited the effectiveness of the go-shop process."[175] The Court of Chancery even acknowledged that "[e]xceptional bidders like

---

[170] *Id.* at *44.

[171] *Id.* at *43 n.42.

[172] *Id.* at *44. Icahn also advised stockholders that he considered Mr. Dell "a major liability" to the Company. *Id.* at *44 n.44.

[173] *Id.* at *5, *44. Given Mr. Dell's testimony and actions, the Court of Chancery suggested, "[i]n a different case in which a key employee was less forthcoming, a comparable commitment might not be as persuasive." *Id*. at *44.

[174] *Id.*

[175] *Id.*

58

Blackstone and Icahn could overcome" such barriers,[176] and the court did not identify any possible bidders that were actually deterred because of Mr. Dell's status.

## C. Market Data Conclusion

The actual facts concerning Dell's market values—the particularities of its stock market and the sale process—demonstrate that the Court of Chancery's reasons for assigning no weight to the market values are flawed. The apparent efficiency of Dell's pre-signing stock market and the long-term approach of its analysts undermine concerns of a "valuation gap." Competition limited to private equity bidders does not foreclose the sale price reflecting fair value, especially where the special committee instituted and oversaw a robust post-signing go-shop process. And, though the Court of Chancery's theories about MBOs might hold up as applied to other facts, they are not supported by the facts here. This was a case where the supposed prerequisite elements for problematic MBOs did not exist: rival bidders faced minimal structural barriers to a deal; extensive due diligence and cooperation from the Company helped address any information asymmetries that might otherwise imply the possibility of a winner's curse; and, assuming his value, Mr. Dell would have participated with rival bidders.

Taken as a whole, the market-based indicators of value—both Dell's stock price and deal price—have substantial probative value. But here, after examining the sale process, the Court of Chancery summarized that, "[t]aken as a whole, the Company did not establish that the outcome of the sale process offers the *most reliable* evidence of the Company's

---

[176] *Id.*

value as a going concern."[177] These two statements are not incongruous, and the Court of Chancery's statement is not a rational reason for assigning no weight to market data. There is no requirement that a company prove that the sale process is the *most reliable* evidence of its going concern value in order for the resulting deal price to be granted any weight. If, as here, the reasoning behind the decision to assign no weight to market data is flawed, then the ultimate conclusion necessarily crumbles as well—especially in light of the less-than-surefire DCF analyses—as demonstrated below.

In so holding, we are not saying that the market is always the best indicator of value, or that it should always be granted some weight. We only note that, when the evidence of market efficiency, fair play, low barriers to entry, outreach to all logical buyers, and the chance for any topping bidder to have the support of Mr. Dell's own votes is so compelling, then failure to give the resulting price heavy weight because the trial judge believes there was mispricing missed by all the Dell stockholders, analysts, and potential buyers abuses even the wide discretion afforded the Court of Chancery in these difficult cases. And, of course, to give no weight to the prices resulting from the actions of Dell's stockholders and potential buyers presupposes that there is a more plausible basis for determining Dell's value in the form of expert testimony, such as from the petitioners' expert, who argued that his DCF analysis showed the fair value of Dell's stock is $28.61 per share[178]—almost three

---

[177] *Id.* (emphasis added).

[178] *Id.* at *45.

times higher than the unaffected stock price of $9.97 per share[179] and more than two times higher than the deal price of $13.75 per share.

### D. The Discounted Cash Flow Analyses

We pause to note that this appraisal case does not present the classic scenario in which there is reason to suspect that market forces cannot be relied upon to ensure fair treatment of the minority. Under those circumstances, a DCF analysis can provide the court with a helpful data point about the price a sale process would have produced had there been a robust sale process involving willing buyers with thorough information and the time to make a bid. When, by contrast, an appraisal is brought in cases like this where a robust sale process of that kind in fact occurred, the Court of Chancery should be chary about imposing the hazards that always come when a law-trained judge is forced to make a point estimate of fair value based on widely divergent partisan expert testimony.

As is common in appraisal proceedings,[180] each party—petitioners and the Company—enlisted highly paid, well-credentialed experts to produce DCF valuations.[181]

---

[179] *See id.* at *17; *see also id.* (noting that the deal price reflected an "approximately 37% premium over the ninety-day-average unaffected trading price of $9.97").

[180] *See, e.g.*, *DFC*, 2017 WL 3261190, at *31 (describing "briefs and expert reports written by highly-skilled litigators in concert with men and women of valuation science that often come to ridiculously varying positions").

[181] *Folk*, *supra* note 129, § 262.10, at 9-235 to 9-236 (describing the DCF methodology as "based on the premise that the value of a company is equal to the present value of its projected future cash flows."); Jesse A. Finkelstein & John D. Hendershot, *Appraisal Rights in Mergers and Consolidations*, 38-5th C.P.S. § V, at A-37 to A-38 (BNA) (noting that the "DCF methodology rests on three basic components: (i) projections of operating cash flows, (ii) terminal value, and (iii) the discount rate"—but that the outcomes using this "basic structure" can vary greatly depending on the assumptions and methods employed).

61

But their valuations landed galaxies apart—diverging by approximately $28 billion, or 126%.[182] Petitioners' expert arrived at a per-share valuation of $28.61 as of the merger date, and the Company's expert produced a valuation of $12.68 per share. The Court of Chancery recognized that "[t]his is a recurring problem,"[183] and even believed the "market data is sufficient to exclude the possibility, advocated by the petitioners' expert, that the Merger undervalued the Company by $23 billion."[184] Thus, the trial court found petitioners' valuation lacks credibility on its face. We agree. Yet, the trial court believed it could reconcile these enormous valuation chasms caused by the over 1,100 variable inputs in the competing DCFs and construct a DCF that more appropriately reflected the fair value of Dell's stock than the market data.[185] And, reconciling the various agreements and divergences among the experts, the trial court determined fair value to be $17.62.

To underscore our concern with the Court of Chancery's decision to give no weight to Dell's stock market price or the deal price and, instead, arrive at a value nearly $7 billion above the transaction price, we consider the trial court's concluding explanation for its reasoning:

---

[182] *Dell Trial Fair Value*, 2016 WL 3186538, at *45.

[183] *Id.*

[184] *Id.* at *44. We calculate the differential to be $26 billion, not $23 billion.

[185] *But see In re SWS Group, Inc.*, 2017 WL 2334852, at *11 (Del. Ch. May 30, 2017) (observing that a DCF calculation is "only as reliable as the inputs relied upon and the assumptions underlying those inputs"); *Huff Fund Inv. P'ship v. CKx, Inc.*, 2013 WL 5878807, at *1 (Del. Ch. Nov. 1, 2013) ("[T]he unpredictable nature of the income stream from the company's primary asset renders the apparent precision of the expert witnesses' cash flow valuation illusory"), *adhered to*, 2014 WL 2042797 (Del. Ch. May 19, 2014), *judgment entered sub nom.*, *Huff Fund Inv. P'ship v. CKX, Inc.* (Del. Ch. June 17, 2014).

The fair value generated by the DCF methodology comports with the evidence regarding the outcome of the sale process. The sale process functioned imperfectly as a price discovery tool, both during the pre-signing and post-signing phases. Its structure and result are sufficiently credible to exclude an outlier valuation for the Company like the one the petitioners advanced, but sufficient pricing anomalies and disincentives to bid existed to create the possibility that the sale process permitted an undervaluation of several dollars per share. Financial sponsors using an LBO model could not have bid close to $18 per share because of their IRR requirements and the Company's inability to support the necessary levels of leverage. Assuming the $17.62 figure is right, then a strategic acquirer that perceived the Company's value could have gotten the Company for what was approximately a 25% discount. [But g]iven the massive integration risk inherent in such a deal, it is not entirely surprising that HP did not engage and that no one else came forward. Had the valuation gap approached what the petitioners' expert believed, then the incentives to intervene would have been vastly greater.

Because it is impossible to quantify the exact degree of the sale process mispricing, this decision does not give weight to the Final Merger Consideration. It uses the DCF methodology exclusively to derive a fair value of the Company.[186]

What this statement means is that the Court of Chancery's DCF value was the antithesis of any economist's definition of fair market value. The Court of Chancery conceded that its DCF value did not reflect a value deemed attractive to the buyers of Dell's 1,765,369,276 publicly traded shares. Further, it did not reflect the value that private equity buyers (including the biggest players such as KKR, TPG, and Blackstone) put on it, as it was too high for any of them to pay. The trial court also picked a price higher than any strategic would pay because, in economic terms, no strategic believed it could exploit a purported $6.8 billion value gap because the risks and costs of acquiring Dell and integrating it into

---

[186] *Dell Trial Fair Value*, 2016 WL 3186538, at *51.

its company dwarfed any potential for profit and synergy gains if Dell were purchased at the Court of Chancery's determination of fair value.[187]  And, of course, as to all buyers, strategic and financial, the Court of Chancery found that a topping bid put them at hazard of overpaying and succumbing to a winner's curse.

When an asset has few, or *no*, buyers at the price selected, that is not a sign that the asset is stronger than believed—it is a sign that it is weaker.  This fact should give pause to law-trained judges who might attempt to outguess all of these interested economic players with an actual stake in a company's future.  This is especially so here, where the Company worked hard to tell its story over a long time and was the opposite of a standoffish, defensively entrenched target as it approached the sale process free of many deal-protection devices that may prevent selling companies from attracting the highest bid. Dell was a willing seller, ready to pay for credible buyers to do due diligence, and had a CEO and founder who offered his voting power freely to any topping bidder.

Given that we have concluded that the trial court's key reasons for disregarding the market data were erroneous, and given the obvious lack of credibility of the petitioners' DCF model—as well as legitimate questions about the reliability of the projections upon which all of the various DCF analyses are based—these factors suggest strong reliance upon the deal price and far less weight, if any, on the DCF analyses.

In addition to the relatively sound economic reasons, there are also important policy reasons supporting this result.  If the reward for adopting many mechanisms designed to

---

[187] The trial court did not cite any evidence for the "massive integration risk" that it believed to exist, and we find none in the record.  *See id.*

minimize conflict and ensure stockholders obtain the highest possible value is to risk the court adding a premium to the deal price based on a DCF analysis, then the incentives to adopt best practices will be greatly reduced. Although widely considered the best tool for valuing companies when there is no credible market information and no market check, DCF valuations involve many inputs—all subject to disagreement by well-compensated and highly credentialed experts—and even slight differences in these inputs can produce large valuation gaps. Here, management's projections alone involved more than 1,100 inputs, and the experts' fair value determinations (which also included several novel tax issues discussed below) landed on different planets. Rather than gambling on an appraisal's battle of the experts, transactional planners might instead propose alternative routes (such as squeeze-outs) to CEOs and founders that will be less attractive for diversified investors in public companies and will likely result in going-private transactions occurring at a lower, not higher, value.

Despite our sentiments, to aid the Court of Chancery if it justifies granting any weight to the DCF on remand, we address the specific issues raised by the parties in their appeals and cross-appeals.

### i. Tax Issues

We note at the outset that the Company challenges the Court of Chancery's treatment of somewhat novel tax issues. These issues involve highly fact-specific, subjective determinations—the outcomes of which can cause wide differences in the

ultimate DCF valuation.[188]   The parties have focused proportionately little attention on these issues before this Court, adding to our inclination to defer to the trial court, or remand for further consideration, where the record before us is not sufficiently developed on these complex, technical issues.

### a.  Terminal Period Tax Rate

Dell argues that the Court of Chancery abused its discretion in using Dell's 21% effective tax rate, rather than the top marginal tax rate under U.S. law (and an addition for state taxes) in its model's terminal period.   But this effective tax rate reflected the Company's operative reality as of the merger date, and the evidence supports the Court of Chancery's decision that this operative reality was likely to continue.   There is precedent favoring adopting tax rates consistent with the operative reality of the company under consideration.[189]  The 21% tax rate is just that—in line with Dell's history and apparently consistent with its tax-paying future.  For example, Dell paid effective tax rates ranging from 16.5% to 29.2% in the five years before the Merger[190]—including an average of 18.5% in the three years preceding the Merger[191]—so 21%, the tax rate selected by

---

[188] For example, in its opening brief, the Company aggregates the three asserted "tax errors" as follows: FIN 48 ($1.34 billion), repatriation tax error ($1.28 billion), and marginal tax rate error ($1.71 billion), totaling, potentially, $4.33 billion.  Appellant's Opening Br. at 52.  The Company claims that the aggregate impact of these alleged errors lowers the court's $17.62 per share valuation to $13.29 per share.  *Id.*

[189] *See, e.g.*, *Global GT*, 993 A.2d at 514; *Dell Trial Fair Value*, 2016 WL 3186538, at *48 n.49 (collecting cases).

[190] *Id.* at *48.

[191] *See* Pretrial Stipulation & Order, entered Sept. 30, 2015, at A95 ¶¶ 290-92.

management, is right in the ballpark. JPMorgan and Evercore also used a tax rate of 21% in the terminal periods of their own DCF calculations.[192]

In contrast, in advocating that we apply the marginal tax rate of 35% plus 0.8% for state taxes to all Dell's earnings in the terminal period, the Company urges us to adopt a tax rate that Dell never paid and has no plans of paying. Given the ample reasons to apply the 21% effective tax rate to the terminal period, the Court of Chancery did not abuse its discretion.

### b. Deferred Taxes

We find that the Court of Chancery erred in its conclusion that the effective tax rate accounted for the inevitable taxes that the Company would have to pay upon repatriating its foreign earnings and profits and, thus, remand for further consideration of what repatriation deduction is necessary.

Cash flows need to be available to stockholders in order to add value as part of a company's going concern. And, to be available to stockholders, the cash needs to be in the United States. Further, in order to be in the United States, foreign earnings and profits must be subjected to taxation when they return to the country, i.e., upon repatriation.

The trial court's free cash flow projections in its DCF valuation include *all* earnings, both domestic and foreign. The Court of Chancery's model also applied the *same* effective

---

[192] *E.g.*, JPMorgan Project Denali - Model Outputs Presentation (Jan. 15, 2013), at B504, B507; Evercore Partners Discounted Cash Flow Model (Feb. 6, 2013), at B590; Evercore Partners Discounted Cash Flow Model (Aug. 1, 2013), at B782; JPMorgan Project Denali Model Presentation (Aug. 14, 2013), at A2612, A2614.

tax rate to all of those cash flows because, indeed, the effective tax rate is the aggregate tax rate covering both domestic and foreign earnings: it is lower than the statutory marginal tax rate to account for the lower tax rates applied to income earned abroad, adjusted against the proportion of income coming from each of the respective foreign jurisdictions.[193]

But the Court of Chancery's analysis cannot end there. Though the effective tax rate accounts for the disparate tax treatment of Dell's income in various jurisdictions, including various tax holidays, it *does not* account for the tax consequence upon repatriation,[194] as the Court of Chancery believed.[195] Thus, to cure the existing asymmetry in the Court of Chancery's model, i.e., the model's inclusion of foreign earnings and profits in cash flow without any corresponding tax consequences upon repatriation, the Company

---

[193] *See* Form 10-K 2013, *supra* note 9, at A2013 ("Our effective tax rate can fluctuate depending on the geographic distribution of our world-wide earnings, as our foreign earnings are generally taxed at lower rates than in the U.S. In certain jurisdictions, our tax rate is significantly less than the applicable statutory rate as a result of tax holidays . . . . The differences between our effective tax rate and the U.S. federal statutory rate of 35% principally resulted from the geographical distribution of taxable income discussed above and permanent differences between the book and tax treatment of certain items."); *id.* at A1986 ("[A]ny actions by [the Company] to repatriate non-U.S. earnings for which we have not previously provided for U.S. taxes may impact our effective tax rate.").

[194] *Id.* at A2016 ("We have provided for the U.S. federal tax liability on these amounts [i.e., foreign income] for financial statement purposes, *except for foreign earnings that are considered permanently reinvested outside of the U.S.*") (emphasis added).

[195] *See Dell Trial Fair Value*, 2016 WL 3186538, at *50 ("The Company's CFO testified that the effective tax rate includes deferred taxes, and that the Company's cash tax rate is lower than the effective rate because the effective tax rate includes substantial deferred tax liabilities. In other words, the effective tax rate accounts for the deferred taxes . . . ."). However, Dell's CFO only testified that the Company's effective rate has been lower than the marginal rate of 35% because "income that's earned in foreign jurisdictions, meaning outside the U.S., is taxed at a lower tax rate." Transcript of Thomas Sweet Trial Testimony (Oct. 5, 2015), at A437 [hereinafter Sweet Testimony]; *see also supra* notes 193 and 194.

68

is right that the model needs to account for the *additional*, previously-unaccounted-for tax consequence of repatriation.

However, the Company's proposed $2.24 billion deduction appears excessive as it assumes tax rates of over 30% upon repatriation.[196] Dell's operative reality shows that the Company has never paid close to that rate when repatriating foreign earnings and profit[197] and had no plans to repatriate vast amounts of money in the foreseeable future.[198] In fact, in the past twenty years, Dell only repatriated "significant" amounts of such earnings during repatriation tax holidays[199] and never paid more than 5.25% on such earnings and profit.[200] Thus, contrary to the Company's proposal, it seems consistent with its operative reality to assume that Dell would only repatriate such earnings and profit when it would be subject to as little tax as possible, signaling that the Company's proposed $2.24 billion deduction is too big.

We remand this issue for further consideration given that the effective tax rate does not account for the future cost of repatriating Dell's foreign earnings. On remand, if the Court of Chancery decides to rely upon a DCF as part of its award, it has the discretion to

---

[196] *See* Corrected Expert Report of Stephen Shay (Aug. 26, 2015), at A4343; Stephen Shay Trial Demonstrative No. 5 at A4372.

[197] Dell never paid the full marginal tax rate when repatriating, *see* Transcript of Stephen Shay Trial Testimony (Oct. 7, 2015), at A1133 [hereinafter Shay Testimony], but the Company's proposed deferred tax deduction used in its DCF model assumes that its repatriation taxes will be paid at the full marginal rate.

[198] Form 10-K 2013, *supra* note 9, at A2063 (noting that Dell intended to reinvest foreign earnings abroad "indefinitely").

[199] *Dell Trial Fair Value*, 2016 WL 3186538, at *48. Dell repatriated $4 billion during a 2004 tax holiday and $9 billion during a 2013 tax holiday. *Id*.

[200] Expert Report of John P. Steines, Jr. (July 24, 2015), at B2377-78.

69

seek additional input from the parties, and from a court-appointed expert, to resolve this issue. We do not dictate any outcome other than that the court's treatment of Dell's foreign earnings must include its corresponding tax consequences. That is, if the Court of Chancery chooses to include foreign earnings in its analysis, it should adjust its model to include some rational tax consequence upon repatriation. Otherwise, the court should exclude those earnings, consistent with its own assumption that they will be reinvested abroad indefinitely and thus never available to pay the Company's stockholders.

### c. FIN 48

Dell's final tax argument on appeal is that the Court of Chancery abused its discretion by reducing its calculation by only $650 million instead of $3.01 billion to account for possible tax liability that the Company could face if tax authorities ultimately disagree with its positions on certain tax issues.

This is a complicated issue for many reasons, not the least of which is the absence of guidance in respected valuation treatises as to how to account for a so-called FIN 48 reserve when conducting a DCF valuation. FIN 48 is the Financial Accounting Standards Board interpretive statement that requires companies to create a reserve to account for tax benefits that are too uncertain to be recognized in a company's financial statements.[201]

Applying this guidance, Dell created a $3.01 billion FIN 48 reserve based on its view that it was more likely than not that $3.01 billion would be due if Dell's positions on certain tax issues were contested. But, in its DCF valuation, the Court of Chancery only

---

[201] Fin. Acct. Standards Bd., *FASB Interpretation No. 48: Accounting for Uncertainty in Income* (2006) (codified at FASB Accounting Standards Codification 740-10-55-3) [hereinafter FIN 48].

subtracted $650 million from its enterprise value, not the full $3.01 billion. On appeal, Dell argues that this was error because the Court of Chancery misunderstood the FIN 48 standard and therefore failed to include the full reserve amount.

Dell is correct as to one part of its argument. In its decision, the trial court collapsed the two-step process for creating this reserve by stating that the FIN 48 reserve "measures the tax payment a company expects to pay if a taxing authority disagrees with its position even though it thinks it is more likely than not that its position is correct."[202] In fact, as the first step in creating the FIN 48 reserve, a company *recognizes* "the financial statement effects of a tax position when it is more likely than not, based on the technical merits, that the position will be sustained upon examination."[203] Then, as the second step, a company must maintain as a liability on its balance sheet "*unrecognized* tax benefits, which are the differences between a tax position taken or expected to be taken in a tax return and the benefit recognized . . . ."[204]

But the problem for Dell is that the error of the Court of Chancery does not translate directly into reversible error for an important reason. There is no agreement in the record that all of a FIN 48 reserve should be deducted when conducting a DCF analysis, and Dell has not cited corporate finance literature supporting its argument that the entirety of a FIN 48 reserve must be deducted. To be fair, Dell has cited corporate finance literature saying

---

[202] *Dell Trial Fair Value*, 2016 WL 3186538, at *50.

[203] FIN 48, *supra* note 201, ¶ 6.

[204] *Id.* ¶ 17 (emphasis added).

71

that the potential for tax liability has to be considered in calculating enterprise value.[205] But, assuming that is right, Dell did not present a persuasive way of doing so when, as under FIN 48, the reserve is dealing with probabilities and, therefore, there is a need to decide on the amount of the reserve to be deducted. In fact, Dell's own expert testified that the question of how to treat FIN 48 reserves was not a common one and that he was unaware of any appraisal treatise that directs appraisers to deduct all of a FIN 48 reserve when calculating enterprise value.[206] By definition, a reserve based on a more likely than not standard has a fairly large degree of uncertainty. And, there was factual testimony here that provided a factual basis for the Court of Chancery's determination to deduct only $650 million.

In his trial testimony, Dell's CFO spoke directly to the likelihood that Dell would face liability on the reserved amounts. That testimony indicated that, between 2013 and 2018, $650 million was the amount of Dell's FIN 48 reserve that was most likely to come

---

[205] *See* Appellant's Opening Br. at 44 n.21 (stating that "there 'may be other claims on the firm that do not show up in debt that you should subtract from firm value' and specifically calling out contingent liabilities" (quoting Asworth Damodaran, *Investment Valuation* 441 (3d ed. 2012))); *see also* Appellant's Reply Br. 26 (citing Shannon Pratt & Roger Grabowski, *Cost of Capital: Applications and Examples* 542 (5th ed. 2014) [hereinafter *Cost of Capital*] ("Liabilities for either current or prior period issues, such as potential judgments or settlements for ongoing litigation, *proposed or potential adjustments to prior income taxes* and environmental cleanup costs, are real liabilities that should be subtracted from the overall business valuation as of the valuation date but are not considered part of the ongoing capital structure of the entity.")) (emphasis added).

[206] Transcript of Glenn Hubbard Trial Testimony (Oct. 7, 2015), at A874-76; *see also Cost of Capital*, *supra* note 205, at 542 [hereinafter Hubbard Testimony] ("Valuation of contingent liabilities requires consideration of the probabilities of payment and the possible timing. The possible outcomes must be converted to an estimate of the present value of the expected amount of the ultimate payment and whether it will be deductible for income tax royalties resulting from the liability.").

due.[207] Given that there is uncertainty in the valuation literature and the record about the extent to which a FIN 48 reserve should be deducted from enterprise value, we cannot find that the Court of Chancery's decision to deduct only the $650 million that was most likely to come due in the near future was an abuse of discretion.

Not only that, but there is evidence in the record that the Company's calculation of its effective tax rate took into account the FIN 48 reserve.[208] Thus, by deducting the portion of the FIN 48 reserve that the record evidence showed was most likely to come due, and adopting an effective tax rate based in part on consideration of the issues addressed by the reserves, the Court of Chancery's decision was grounded in the record.

We are reluctant to speak broadly about this issue because the record below and before us is devoid of reliable guidance about how FIN 48 reserves should be treated in the

---

[207] Sweet Testimony, *supra* note 195, at A470–71.

[208] *See, e.g.*, Sweet Testimony, *supra* note 195, at A480-81; Shay Testimony, *supra* note 197, at A1148-49, 1152-56, A1153-55; *see also* Form 10-K 2013, *supra* note 9, at A2064.

> PETITIONERS' COUNSEL: So all of the years building up to your big 3 billion [FIN 48 Reserve] in 2013 was all in Dell's effective tax rate. Right? . . .
>
> SHAY: [T]he answer is yes for the years that you're describing . . . . [B]ecause I referred to the two years, 2012 and 2013, to derive the effective tax rate that I recommended or opined to Mr. Hubbard that he use for the projection and transition period, yes, the FIN 48 amount is in that effective rate that's applied to the earnings that are used in those cash flows.

Shay Testimony, *supra* note 197, at A1153-55. Petitioners' expert did not include a separate deduction for the FIN 48 reserve: he assumed Dell would have accounted for the FIN 48 reserve when calculating the effective tax rate of 21%, which he applied to all cash flows. *See* Transcript of Bradford Cornell Trial Testimony (Oct. 5, 2015), at A277, A281-82; *Dell Trial Fair Value*, 2016 WL 3186538, at *48. The appellees do not argue on cross-appeal that it was error for the Court of Chancery to exclude the $650 million of the FIN 48 reserve that Dell's CFO testified was most likely to be owed during the projection period.

73

calculation of a DCF. The unreliability of the record and our duty to respect the difficult task of trial judges in these cases leaves us unprepared to disturb the Court of Chancery's ultimate finding on this issue, despite its misstatement of the FIN 48 standard.

### ii. Cross-Appeals

Petitioners cross-appealed alleging that, to the extent the Court of Chancery erred in formulating its DCF, it did so by adopting the revisions that Dell's expert applied to the BCG 25% Case projections and including deductions for working capital and restricted cash. We find that these choices do not amount to an abuse of discretion.[209]

### a. Projection Adjustments

The Court of Chancery did not abuse its discretion in adjusting the BCG 25% Case projections, which it factored into one of the two DCF calculations that it later averaged to arrive at its final determination of fair value. Though petitioners argue that the BCG 25% Case underestimated cost savings,[210] both experts agreed that it was largely reliable.[211]

---

[209] BCG's projections included three different cases. The "BCG Base Case" was more pessimistic than management's "September Case." The two other cases assessed the likelihood of achieving cost-saving initiatives. One assumed that Dell would realize 25% of management's intended cost savings (the "BCG 25% Case"), and the other assumed that the Company would realize 75% of the savings (the "BCG 75% Case"). *Dell Trial Fair Value*, 2016 WL 3186538, at *10.

[210] *See* Appellees' Ans. Br. at 62 (arguing that the Court of Chancery erred by adopting "a set of projections that assumed Dell would take out *less in costs over a three-year period than it had already taken out by the end of FY 2014*.").

[211] *Dell Trial Fair Value*, 2016 WL 3186538, at *45.

Petitioners' attorney also conceded at oral argument that "[e]veryone agrees that th[e] BCG 25% Case] is the best set of projections."[212]

Petitioners also question the decision of Dell's expert, Hubbard, to update the projections to reflect the latest pre-Merger IDC report (August 2013) that suggested PC sales would continue to decline even further than anticipated industry-wide. Given that BCG had previously adjusted its projections to account for new IDC forecasts,[213] it would seem to make sense that the projections as of the date of the Merger would need to include the most recent figures.

But petitioners argue that the projections' creator, Lutao Ning of BCG, testified at trial that one could not simply swap out old IDC data for new figures[214] and that, regardless, the IDC numbers only corroborated the accuracy of BCG's projections because the projections forecasted such declines.[215] We defer to the Court of Chancery's assessment of this testimony and its decision to adjust for the latest IDC report, especially since the trial court attempted to balance the "likely somewhat conservative" Adjusted BCG 25% Case against the "likely somewhat optimistic" adjusted Bank Case projections in the

---

[212] Oral Argument before the Delaware Supreme Court at 42:11, https://livestream.com/accounts/5969852/events/7748349/videos/163426742.

[213] After initially providing its projections to the Special Committee on January 2, 2013, BCG "updated its projections slightly to account for new information from the bankers and a new IDC data set." *Dell Trial Fair Value*, 2016 WL 3186538, at *10. BCG did not update its projections after January 2013. *Id.* at *45.

[214] Transcript of Lutao Ning Trial Testimony (Oct. 6, 2015), at A676-77.

[215] *Id.* at A681-83.

court's final fair value determination.[216]  It averaged two DCF valuations using all the same inputs other than these two sets of projections in arriving at its final fair value figure.  This choice, which is unchallenged, was designed to minimize any over-pessimism in tweaking the IDC numbers.  The Court of Chancery had logic for its adjustment to the projections, and this adjustment did not amount to an abuse of discretion.

### b. Cash

Petitioners also challenge the Court of Chancery's deductions of $3 billion for working capital and $1.2 billion for restricted cash from Dell's enterprise value.  Neither of these judgment calls amounts to an abuse of discretion.

Dell's CFO testified that the Company needed at least $5 billion in working capital[217] to support its operations (including $2 billion restricted cash),[218] and documentary evidence corroborates this view.[219]  It was reasonable for the Court of Chancery to believe this evidence supported the working capital deduction.  Dell's CFO testified that the Company needed cash on hand to accommodate "seasonality" and

---

[216] *See Dell Trial Fair Value*, 2016 WL 3186538, at *47, *51 (noting that the court had "no reason to prefer one realistic case over the other").

[217] "Working capital is derived by subtracting current liabilities from current assets and represents the capital the business has at its disposal to fund operations." *Merion Capital, L.P. v. 3M Cogent, Inc.*, 2013 WL 3793896, at *13 (Del. Ch. July 8, 2013), *judgment entered sub nom. Merion Capital, L.P v. 3M Cogent, Inc.* (Del. Ch. July 23, 2013) (quoting *Gholl v. Emachines, Inc.*, 2004 WL 2847865, at *14 n.97 (Del. Ch. Nov. 24, 2004)).

[218] Sweet Testimony, *supra* note 195, at A431-33.

[219] Working Capital Update (Jan. 2013), at AR3; Denali Acquiror Inc. Rating Agency Presentation (Aug. 2013), at AR48; LBO Project Update - Treasury Ops (Sept. 3, 2013), at AR85; Silver Lake, "Project Denali Illustrative LBO & Operating Model" Presentation (Sept. 17, 2013), at AR99.

"geographical friction,"[220] and the Court of Chancery did not abuse its discretion in crediting this testimony.

The Court of Chancery also did not abuse its discretion in deducting $1.2 billion of the $2 billion deduction for restricted cash advocated by the Company.[221] The trial court did not deduct $0.8 billion of that total because evidence showed it had become unrestricted before the Merger and thus could no longer be counted among the restricted pool.[222] There was some evidence at the time of the Merger that some Chinese regulations that restricted much of the cash were changing so as to allow Dell to access it and thus also eliminate the need for a portion of the remaining $1.2 billion deduction.[223] But the record does not specify how much capital was likely to become unrestricted. Thus, we defer to the Court of Chancery's judgment in declining to shrink the deduction even further in light of the sparse record on restricted cash.

### III. Fair Value Conclusion

Despite the sound economic and policy reasons supporting the use of the deal price as the fair value award on remand, we will not give in to the temptation to dictate that result. That said, we give the Vice Chancellor the discretion on remand to enter judgment at the deal price if he so chooses, with no further proceedings. If he decides to follow

---

[220] Sweet Testimony, *supra* note 195, at A432-33.

[221] *Id.* at A431, A433.

[222] *Dell Trial Fair Value*, 2016 WL 3186538, at *50. Dell's expert admitted at trial that the restricted cash deduction would be unnecessary if Dell could ever access the money. *See* Hubbard Testimony, *supra* note 206, at A867-70. Dell's expert explained, "If you could bring it back costlessly today, you shouldn't be subtracting it." *Id.* at A869.

[223] Sweet Testimony, *supra* note 195, at A433-34.

77

another route, the outcome should adhere to our rulings in this opinion, including our findings with regard to the DCF valuation. If he chooses to weigh a variety of factors in arriving at fair value, he must explain that weighting based on reasoning that is consistent with the record and with relevant, accepted financial principles.

## IV. *Attorneys' Expenses and Fees*

One final thing—our reversal of the Court of Chancery's fair value determination does not resolve all the appeals before us. A cross-appeal from the petitioning party with the greatest number of shares actually entitled to appraisal, Magnetar Capital Master Fund Ltd, and a few other petitioners represented by the same law firms[224] challenges the Court of Chancery's allocation of expenses. These cross-appellants contend that the Court of Chancery abused its discretion[225] in allocating *all* of the expenses incurred by Lead Counsel[226] in litigating the fair value determination among *only* those shares actually entitled to appraisal. The cross-appellants' shares accounted for just 14% of the shares that initially demanded appraisal, and thus the cross-appellants argue that it was unfair for the court to saddle them with all the expenses while allowing T. Rowe Price & Associates ("T. Rowe"), which was initially the largest petitioner, to avoid paying anything.

The appraisal class was originally much larger than the 5,505,730 shares ultimately deemed entitled to appraisal. A total of 38,765,130 shares initially demanded appraisal,

---

[224] Heyman Enerio Gattuso & Hirzel LLP and Lowenstein Sandler LLP.

[225] *See Scion Breckenridge Managing Member v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 675 (Del. 2013) (reviewing fee award for abuse of discretion).

[226] Grant & Eisenhofer P.A.

and Lead Counsel obtained that status because it represented 83% of those shares. The Company challenged the entitlement to appraisal of many of those shares. A group of entities tied to T. Rowe beneficially owned a large portion of the disputed shares, 26,732,930 shares. But though the qualifications of those shares were contested, the parties agreed to delay resolution of their entitlement until after the fair value trial. Lead Counsel thus retained its status and litigated the fair value trial.

After trial, the Court of Chancery ultimately held that T. Rowe's shares had actually voted *for* the Merger and thus were *not* entitled to appraisal. T. Rowe had the option to appeal that decision.

But T. Rowe soon gained settlement leverage from the post-trial decision on fair value a few weeks later: the decision awarded $3.87 per share more than the deal price to the shares entitled to appraisal. Given the threat that T. Rowe might appeal the decision on its entitlement to appraisal and, if it succeeded, be entitled to the higher fair value award (if that also survived an appeal), T. Rowe was able to strike a settlement with the Company for the Merger consideration plus $28 million in interest.[227] (Lead Counsel received $4.2 million of that amount as its contingency fee.)[228]

Although T. Rowe benefitted from the fair value award through settlement leverage, Lead Counsel chose not to allocate any of its expenses from the fair value litigation to T.

---

[227] *Dell Fees & Expenses*, 2016 WL 6069017, at *5.
[228] *Id.*

Rowe. Rather, Lead Counsel sought an additional benefit for its client by requesting its expenses be paid only by those shares that the trial court actually found entitled to appraisal.

Magnetar objected. (Its 3,865,820 shares accounted for more than 70% of the final appraisal class.)[229] But the Court of Chancery denied its objection. First, the Court of Chancery held that it could not require T. Rowe to bear any of the expenses because Section 262(j) provides that the Court of Chancery has discretion to "order all or a portion of the expenses" incurred through the appraisal proceedings "pro rata against the value of all the shares *entitled to an appraisal*."[230] The Court of Chancery had held that T. Rowe's shares were actually not *entitled to appraisal*. Thus, the court relied on the statutory language in deciding not to award expenses against T. Rowe and, instead, allocated the expenses against the rightful appraisal class—those *entitled to appraisal*—even though Section 262(j) also provides that the court may allocate merely "a portion" of such expenses against those shares. The court found the expenses "proportionate to the benefit achieved," as also measured against the size of the final appraisal class, and thus deemed it reasonable to apportion them among solely the shares entitled to appraisal.[231]

At the same time, the trial court acknowledged that, despite the language of Section 262(j), it "could achieve the same functional result [sought by Magnetar] simply by

---

[229] *Id.* at *2, *4. Following various rulings, 5,505,730 shares remained in the appraisal class. *Id.* at *4. This was a reduction of approximately 86% from the 38,765,130 shares that originally appeared on the verified list. *Id.* at *4, *12.

[230] 8 *Del. C.* 262(j) (emphasis added).

[231] *Dell Fees & Expenses*, 2016 WL 6069017, at *12 ("[T]he expenses of appraisal litigation do not scale proportionately with the size of the appraisal class.").

80

reducing the total amount of expenses that it awards to [Lead Counsel], because a reduced award would force [Lead Counsel] to bear those expenses in the first instance and likely seek reimbursement from T. Rowe."[232] But the Court of Chancery resisted that approach because it viewed Magnetar's requested allocation as "really an effort to reduce their share of the expenses."[233]

We conclude that the resulting allocation was inequitable and cannot stand. Even if the Court of Chancery objected to Magnetar's requested apportionment of expenses, the trial court surely had the capacity to craft a reasonable and equitable solution—one that takes into account T. Rowe's relationship with Lead Counsel, their control of the litigation, and the reciprocal benefits they obtained as a result.

We fail to see how the Court of Chancery could refuse to reduce the amount of expenses owed by Magnetar and other stockholders entitled to appraisal to account in some balanced and fair way for the benefits that Lead Counsel obtained through its representation of T. Rowe and that T. Rowe obtained thanks to the fair value award and the settlement leverage it gained by delaying resolution of its entitlement to appraisal until after trial. Section 262(j) plays an important role in preventing free-riding by petitioners at the expense of other petitioners. That role also includes not enabling unfair opportunism by a large petitioner who wields its clout to secure control of an appraisal and then uses the

---

[232] *Id.*

[233] *Id.*

leverage of the appraisal to obtain a favorable settlement at a time when its entitlement to appraisal is in doubt and subject to definitive resolution on appeal.

Given our rulings on fair value here, we decline to address the precise manner in which the Court of Chancery must account on remand for T. Rowe's role in this litigation, its relationship with Lead Counsel, and the benefits it obtained. But we hold that it must do so. Although the Court of Chancery need not award expenses against T. Rowe, it must make a reasoned and sizable reduction in those awarded against the shares entitled to appraisal to account for the fair share T. Rowe should have borne, but that Lead Counsel chose not to seek from it. To the extent Lead Counsel wished to cut T. Rowe a break, it should not have done so against the other petitioners to whom it owed a fiduciary duty as Lead Counsel.

Consistent with this decision, we grant Magnetar leave to seek a reasonable fee from other petitioners who benefit from its efforts to reduce the expense award against the shares entitled to appraisal, and the Court of Chancery shall consider any such application in the course of resolving any further dispute about expenses that arises on remand.