**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| B.E. CAPITAL MANAGEMENT FUND LP, | ) ) ) | |
| Petitioner. | ) ) | |
| v. | ) ) | C.A. No. 12843-JTL |
| FUND.COM INC., | ) ) ) | |
| Respondent. | ) | |

**OPINION ADDRESSING OBJECTION TO SALE PROCESS AND REQUEST FOR STATUS QUO ORDER**

Date Submitted: April 7, 2026
Date Decided: April 10, 2026

Peter Lydon Sheeran, Jr., *Pro se.*

Russell C. Silberglied, RICHARDS, LAYTON & FINGER P.A., Wilmington, Delaware; *Receiver of Fund.com Inc.*

**LASTER, V.C.**

Fund.com Inc. (the "Company") is a defunct corporation. The court originally appointed Thomas Braziel as receiver. After Braziel's defalcations came to light, the court removed Braziel and imposed remedies against him. The court appointed a successor receiver (the "Receiver") charged with maximizing the value of the Company's assets for the benefit of its claimants, including both creditors and equity holders in order of priority.

The Receiver is currently seeking to maximize the value of the Company's claims against a company subject to liquidation in New Zealand (the "Assets"). The Receiver has constructed a sale process and permitted Braziel to participate as a potential buyer.

Peter Lydon Sheeran, Jr. objects to Braziel's participation. He seeks an order preventing the Receiver from permitting, soliciting, entertaining, or accepting any bid from Braziel and requiring any bidder to certify that it is not acting on behalf of, in concert with, or for the benefit of Braziel.

Sheeran contends—and I credit for purposes of his objection—that Braziel has an informational advantage over other bidders concerning the Assets. Braziel was personally involved in procuring the Assets, and there are gaps in the due diligence information available to other bidders about some of the actions Braziel took that could affect the value of the Assets. Given his first-hand involvement, Braziel has superior knowledge about what he did and hence, as to those issues, can better assess risk than other bidders.

The Receiver argues that Sheeran lacks standing to sideline a competing bidder. In my view, Sheeran has standing to challenge the sale process from the standpoint of whether it can generate the best value for the Assets.

This court's analysis must start by determining the standard of review. If the order appointing a receiver specifies a standard of review, then that standard applies.[1] Here, the court's order appointing the Receiver did not specify a standard of review.

The next consideration is the type of receiver. The State empowers some receivers to act by statute—the principal example is the Insurance Commissioner—warranting presumptively deferential review.[2] When a court appoints a private individual to act as a receiver, however, the appointment is akin to empowering a special magistrate.[3] The default standard of review is therefore *de novo*, particularly

---

[1] *See In re Dissolution of Jeffco Mgmt., LLC*, 2021 WL 3611788, at *6 (Del. Ch. Aug. 16, 2021) ("Frequently, the applicable standard of review for a receiver's decisions is reflected in the order appointing the receiver. . . . In the absence of a standard of review in the order appointing the receiver, this court has looked to the relevant statutes, rules, and case law for guidance."), *aff'd,* 285 A.3d 125 (Del. 2022).

[2] *See Matter of Scot. Re (U.S.), Inc.*, 273 A.3d 277, 293 (Del. Ch. 2022) ("The parties broadly agree that an abuse of discretion standard governs the Commissioner's request. Black letter authorities generally state that an abuse of discretion standard applies when a court reviews the decision of an insurance commissioner acting as a receiver for a delinquent insurer. Cases from other jurisdictions regularly use an abuse of discretion standard when reviewing a rehabilitation plan that an insurance commissioner has proposed. The parties have not cited, and research has not revealed, any case that applies the abuse of discretion standard to a one-off issue like the request to make the Pre-Plan Payments that is not part of a broader rehabilitation plan. . . . Logically, the same standard should apply." (footnotes omitted)).

[3] *See B.E. Cap. Mgmt. Fund LP v. Fund.com Inc.*, 171 A.3d 140, 146 (Del. Ch. 2017).

when the receiver addresses a legal issue or makes a claim determination in a manner

akin to a court.[4]

But a receiver must also make more business-oriented and judgment-laden

decisions when winding down a business and maximizing the value of its assets.

> [I]n a situation where a receiver or custodian has exercised judgment regarding the business and affairs of a corporation, such as when selling assets or settling a claim, a more deferential standard of review would seem warranted. Indeed, where the receiver or custodian has exercised the powers that otherwise would rest with the board of directors, a strong argument could be made that the standard of review should be at least as deferential as the standard that would apply to the board's decision in the same context.[5]

When selling an asset in the ordinary course of business to an unaffiliated buyer, a

board presumptively receives the protection of the business judgment rule. The

standard elevates to enhanced scrutiny only if the sale of assets effectively operates

as a sale of the company, such as when the sale involves all or substantially all of the

company's assets and will be followed by dissolution.[6] The standard elevates to entire

---

[4] *See Jeffco Mgmt.*, 2021 WL 3611788, at *6 ("I conclude that the Receiver's decision to disregard the Revised Balance is subject to *de novo* review."); *B.E. Cap. Mgmt.*, 171 A.3d at 146 ("This decision therefore concludes that a *de novo* standard of review applies when this court considers an appeal from a receiver's determination of a creditor's claim.").

[5] *B.E. Cap. Mgmt.*, 171 A.3d at 146 (footnotes omitted).

[6] *See In re Dura Medic Hldgs., Inc. Consol. Litig.*, 331 A.3d 796, 832–33, 839 (Del. Ch. 2025) (applying enhanced scrutiny to sale of assets that presented same considerations as sale of the company for cash; upholding sale as falling within range of reasonableness); *see generally Young Women's Christian Ass'n of Rochester & Monroe Cnty. v. Hatteras Funds, LP*, — A.3d —, —, 2026 WL 851163, at *20 (Del. Ch. Mar. 27, 2026) ("For the fiduciaries considering the transaction, a sale of assets in contemplation of dissolution presents the same issues as a sale or merger.").

fairness only when the directors approving the sale do not comprise a disinterested and independent majority of the board who acted in good faith and with due care. After the Safe Harbor Amendments of 2025,[7] corporate fiduciaries whose actions come within one of the safe harbors receive remedial immunity.[8] The pre-amendment standards, however, continue to govern should it become necessary to evaluate whether a breach occurred, such as for purposes of an aiding-and-abetting claim or if none of the safe harbors apply.

The Receiver is disinterested and independent. He is not subject to the situational pressures that animate enhanced scrutiny. A similarly situated board would enjoy the protections of the business judgment rule. A comparable standard of review should therefore protect the Receiver's decision. The court will examine the Receiver's decision to allow Braziel to participate under an abuse of discretion standard. That effectively requires that the decision be rational.

Whether to permit Braziel to participate in the sale process presents a questions of auction design and game theory. To be sure, Braziel has been adjudicated as a faithless fiduciary, and the court has imposed remedies on him. Sheeran argues that he should be barred on that basis, and there could be circumstances where that would be warranted. Here, however, Braziel's cash has the same purchasing power

---

[7] 85 Del. Laws ch. 6 § 1 (2025).

[8] *See* 8 *Del. C.* 144 §§ (a)-(c) (stating that such actions "may not be the subject of equitable relief, or give rise to an award of damages").

as anyone else's. It does not benefit the Company or its investors to prevent Braziel from participating if he can pay the highest price.

The question instead is whether Braziel's participation will impair the sale process. And it could. Superior access to information functions as a subsidy for the bidder that possesses it.[9] When competing against another party with an informational advantage, the less-informed party risks the winner's curse. If the less-informed party bids and wins, that party has just learned that it thinks the asset is worth more than the party that knows more. Perhaps the winning bidder is smarter, but absent some type of edge, the winner has to worry that they have almost certainly overpaid.[10]

Less informed bidders can compensate for that risk by conducting due diligence, by using their own independent knowledge, or by hiring experts, but some informational asymmetries are difficult to overcome.[11] The effect of disparate

---

[9] *Merion Cap. L.P. v. Lender Processing Servs., Inc.*, 2016 WL 7324170, at *19 (Del. Ch. Dec. 16, 2016) ("If a seller only makes information available to one bidder, then the seller has given that bidder a subsidy.").

[10] *In re Appraisal of Dell Inc.*, 2016 WL 3186538, at *42 (Del. Ch. May 31, 2016), *aff'd in part, rev'd in part on other grounds sub nom.*, *Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd*, 177 A.3d 1 (Del. 2017).

[11] *See* J. Russel Denton, *Note, Stacked Deck: Go-Shops and Auction Theory*, 60 Stan. L. Rev. 1529, 1546 (2008) ("Just as Person B would not want to bid against Person A for the contents of Person A's wallet, no financial buyer would want to bid against a financial buyer working with management.").

information is also less significant in a private value auction than in a common value auction.[12]

The sale process for the Assets looks like a common value auction where Braziel has a source of asymmetric information that a less-informed bidder would have difficulty overcoming. What is the less-informed bidder likely to do in that situation? "Sophisticated parties look forward and reason back."[13] They consider not only the value of the incumbent bid, but also whether they have a path to success. Without the second half of the equation, an overbidder might force the incumbent bidder to pay more, but cannot prevail (or at least is highly unlikely to prevail without suffering the winner's curse). "Participating in a sale process is not free, so without a realistic path to success, it is irrational to try."[14] Sheeran has already taken this position. He says that if Braziel can participate in the bidding, then he will not. That, of course, is his choice, but if all potential bidders other than Braziel take that route, then Braziel would stand alone. If Braziel knew he was the only bidder, he could underbid and get the Assets on the cheap. Including Braziel therefore could backfire and fail to generate the highest value.

---

[12] *Merion Cap.*, 2016 WL 7324170, at *19.

[13] *In re Sears Hometown & Outlet Stores, Inc. S'holder Litig.*, 309 A.3d 474, 524 (Del. Ch. 2024).

[14] *Id.*; *see generally* Guhan Subramanian & Annie Zhao, *Go-Shops Revisited*, 133 Harv. L. Rev. 1215, 1218 (2020) (discussing effect of match rights and winner's curse on go-shop results).

Competition is the surest way to generate the highest price. "Whether it should be so or not, human beings often value things—even other human beings like romantic partners—more when others might claim them."[15] Involving more actual or potential competitors increases the likelihood of higher bids.[16] If excluding Braziel

[15] *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 615 (Del. Ch. 2010).

[16] *See* Nihat Aktas et al., *Negotiations Under the Threat of Auction,* 98 J. Fin. Econ. 241, 242 (2010) ("Our empirical results confirm the existence of latent competition on acquirers' bidding in one-on-one negotiations: More potential competitors are associated with higher bids."); Jacob K. Goeree & Theo Offerman, *Competitive Bidding in Auctions with Private and Common Values*, 113 Econ. J. 598, 611 (2003) (explaining that having "all potentially interested bidders participate" before signing produces "more competition [and] results in a more efficient allocation" of surplus between the buyer and seller); *id.* at 600 ("Another factor improving efficiency is an increase in competition: expected efficiency and expected revenue increase with each extra bidder. In the limit when the number of bidders goes to infinity, an efficient allocation again materializes. Interestingly, the effect of more competition on efficiency and revenues is stronger than the effect of information provided by the auctioneer. When the seller has the choice between finding more interested bidders or providing information about the value of the commodity, she should choose the former."); Jeremy Bulow & Paul Klemperer, *Auctions Versus Negotiations*, 86 Am. Econ. Rev. 180, 180 (1996) (conducting an empirical study and concluding that "a single extra bidder more than makes up for any diminution in negotiating power" such that "there is no merit in arguments that negotiation should be restricted to one or a few bidders to allow the seller to maintain more control of the negotiating process, or to credibly withdraw the company from the market"); John C. Easterwood et al., *Controlling the Conflict of Interest in Management Buyouts,* 76 Rev. Econ. & Stat. 512, 513 (1994) (recognizing that "[b]oth actual and potential competing offers could limit the ability of managers to underbid" in MBOs); *id.* at 515 (analyzing a sample of transactions and finding that "implicit outside competition is not associated with higher abnormal returns compared to the returns experienced by stockholders of [MBOs] involving no competition whatsoever"); *id.* at 520 (concluding that "explicit competition from outside bidders is more effective than implicit outside competition"). Renowned M&A practitioner Marty Lipton has contrasted the effects of adding another interested party at the front end of a negotiation with the effect of bargaining more vigorously with a single counterparty at the back end. Lipton even roughly quantified the added value of adding another interested party: "The ability to bring somebody into a situation is far more important than the extra dollar a share at the back end. At the front end, you're probably talking about fifty percent. At the back end, you're talking about 1 or 2 percent." Guhan Subramanian, *The Drivers of Market*

results in multiple bidders participating, then competition may generate the highest price. But if none of those bidders are willing to pay what Braziel would pay, then the sale process again may not generate the highest possible value.

What then should the Receiver do? He must make a judgment that weighs these factors. He must construct a sale process that minimizes the risks. An English auction likely poses the greatest risk. Bidders will know Braziel is involved and can bail out, and Braziel need only top the second-highest bidder's reserve price. A first-price-sealed-bid process could mitigate some of the risk.[17] Other approaches could be pursued. Some measure of expense reimbursement, for example, can sometimes induce a hesitant party to participate.

Those are observations, not suggestions, and certainly not directives. Even under enhanced scrutiny, courts defer to the thoughtful, informed judgments that disinterested and independent fiduciaries make, as long as they fall within a range of reasonableness.[18] What typically causes a decision to fall outside the range of reasonableness is the presence of self-interest that taints the fiduciaries' judgment.[19]

---

*Efficiency in Revlon Transactions*, 28 J. Corp. L. 691, 691 (2003) (quoting Author's Interview with Martin Lipton, Senior Partner, Wachtell, Lipton, Rosen & Katz, in New York, NY (June 14, 2000)).

[17] *See generally Callahan v. Nelson*, 2026 WL 217332, at *3 (Del. Ch. Jan. 28, 2026) (describing pros and cons of English auction versus first-price-sealed-bid process and adopting latter).

[18] *Dura Medic*, 331 A.3d at 837 ("Enhanced scrutiny requires that the fiduciaries show that the transactional outcome fell within a range of reasonableness.").

[19] *See In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 831 (Del. Ch. 2011) ("What typically drives a finding of unreasonableness is evidence of self-interest, undue favoritism or disdain towards a particular bidder, or a similar non-stockholder-

Here, the Receiver is disinterested and independent. Including Braziel presents a combination of risks and benefits. So does excluding him. Neither choice constitutes an abuse of discretion.

The court defers to the Receiver's judgment. The objection is denied. An injunction will not issue.

---

motivated influence that calls into question the integrity of the process."); *accord In re Baker Hughes Inc. Merger Litig.*, 2020 WL 6281427, at *9 (Del. Ch. Oct. 27, 2020); *see also In re El Paso Corp. S'holder Litig.*, 41 A.3d 432, 439 (Del. Ch. 2012) ("[W]hen there is a reason to conclude that debatable tactical decisions were motivated not by a principled evaluation of the risks and benefits to the company's stockholders, but by a fiduciary's consideration of his own financial or other personal self-interests, then the core animating principle of *Revlon* is implicated."); *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1000 (Del. Ch. 2005) (explaining that enhanced scrutiny "is not a license for law-trained courts to second-guess reasonable, but debatable, tactical choices that directors have made in good faith").